[No. A039677. First Dist., Div. Five. Aug. 26, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ANDREW CZAHARA, Defendant and Appellant.

1470

**COUNSEL**

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, David D. Salmon and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LOW, P. J.**—We hold here that a jury should not be instructed on transferred intent to kill when a defendant is charged with multiple attempted murders arising from a single act.

Michael Andrew Czahara appeals his convictions for the attempted murders of Carole Christie and Ronald Johnson. (Pen. Code, §§ 187, 664.) We hold that the jury instruction on transferred intent was erroneous and prejudicial in the circumstances of this case and reverse the conviction for attempted murder of Johnson, but affirm the conviction for attempted murder of Christie.

Carole Christie met Czahara in March 1986, and they began dating in April or May. As the relationship developed, they discussed marriage and agreed to be sexually faithful to each other. Christie, however, began to doubt Czahara's fidelity when she noticed a piece of unfamiliar lingerie hanging on his bathroom door. In late July, Christie began dating Ron Johnson. On September 14, 1986, Christie told Czahara that she did not want to see him any more. Czahara threatened to kill Christie and himself. Christie reported the threat to police and obtained a restraining order against Czahara.

On September 19, Christie was at Johnson's house when she saw Czahara drive slowly by looking in the windows. She called the police and Johnson drove her to her apartment. After Johnson returned home, Czahara called him on the telephone and said, "Send Carole out or I'm coming in." Christie drove to Johnson's house to pick him up to go somewhere safe. Johnson came out of his house and began to sit down in the passenger's seat. At the same time, Czahara walked quickly toward the driver's side of the car, pointed a handgun directly at Christie and, from a distance of five or six feet, shot at least twice. Christie and Johnson were both injured, and their injuries were stipulated to constitute great bodily injury.

Czahara was convicted of two counts of attempted murder and two counts of assault with a deadly weapon (Pen. Code, § 245). Allegations of personal use of a firearm (Pen. Code, § 12022.5) and great bodily injury

(Pen. Code, § 12022.7) were found true as to each count. The court imposed the aggravated term of nine years for the attempt on Carole Christie's life (count one), and added a three-year great bodily injury enhancement. A concurrent term of three years and four months (including bodily injury enhancement) was imposed for the attempted murder of Ronald Johnson (count three). Sentences of four years each for the two assaults (counts two and four) were stayed pursuant to Penal Code section 654. The weapon use enhancements were not imposed.

## I

Over defense objection the court gave jury instruction number 2, which read: "When one attempts to kill a certain person, but by mistake or inadvertence injures a different person, the crime, if any, so committed is the same as though the person originally intended to be killed had been injured." The instruction was a modification of CALJIC No. 8.65 (4th ed. 1979), which states the principle of transferred intent for homicide. **(1a)** Czahara contends that the transferred intent rule was inapplicable here because the intended victim, Carole Christie, was injured in the attempt.

The California Supreme Court has on several occasions approved the rule of transferred intent in homicide cases. (*People* v. *Sears* (1970) 2 Cal.3d 180, 189 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Sutic* (1953) 41 Cal.2d 483, 491-492 [261 P.2d 241]; *People* v. *Suesser* (1904) 142 Cal. 354, 366-367 [75 P. 1093].) The high court has not, however, considered application of the doctrine to homicides in which the intended victim was also killed or to attempted homicides in which the intended victim was injured in the attempt.

Two Court of Appeal panels have considered the question whether transferred intent applies where both the intended and unintended victims of an assault die. In *People* v. *Carlson* (1974) 37 Cal.App.3d 349 [112 Cal.Rptr. 321], the defendant was convicted of voluntary manslaughter for killing his wife and murder for the unintentional death of their unborn child. (*Id.,* at pp. 351-352.) Holding that the murder conviction could not be supported under a felony-murder theory, the court next considered whether the defendant could be convicted of manslaughter of the fetus on a theory of transferred intent. (*Id.,* at pp. 353-356.) The court stated that the law would transfer the defendant's felonious intent from the mother to the fetus, adding that "there can be no doubt that the doctrine of 'transferred intent' applies even though the original object of the assault is killed as well . . . ." (*Id.,* at p. 357.) Nevertheless, the court held that the defendant could not be

convicted of manslaughter of the fetus since the manslaughter statute requires the victim be a "human being." (*Id.,* at pp. 357-358.)

In *People* v. *Birreuta* (1984) 162 Cal.App.3d 454 [208 Cal.Rptr. 635], the defendant had shot into a dark room, killing his wife and a neighbor. He claimed that he was shooting only at the neighbor and that he did not even know his wife was present. (*Id.,* at p. 458.) The court held that the giving of a transferred intent instruction (CALJIC No. 8.65) was error where the intended victim was also killed. (*Id.,* at pp. 460-461.) The holding was based on the purpose of the transferred intent rule as the court saw it, "to insure the adequate punishment of those who accidentaly kill innocent bystanders, while failing to kill their intended victims." (*Id.,* at p. 460.) When the intended victim is killed the killer can be punished for his full culpability with regard to the intended death, while any accidental deaths or injuries are prosecuted and punished according to the culpability normally assessed for those acts. (*Ibid.*) Under those circumstances, the court concluded, there is no need for transferred intent. The *Birreuta* court declined to follow what it characterized as dictum in *Carlson*. (*Id.,* at p. 458.)

In other cases, the Courts of Appeal have applied the doctrine where both the intended and unintended victims were killed (*People* v. *Flores* (1986) 178 Cal.App.3d 74, 79, 81-82 [223 Cal.Rptr. 465]) or injured (*People* v. *Neal* (1950) 97 Cal.App.2d 668, 672-673 [218 P.2d 556]; *People* v. *Rothrock* (1937) 21 Cal.App.2d 116, 118-119 [68 P.2d 364]). In none of those opinions, however, did the courts consider or discuss any challenge to the applicability of the transferred intent doctrine. ▪ " '[C]ases are not authority for propositions not considered therein.' " (*Isbell* v. *County of Sonoma* (1978) 21 Cal.3d 61, 73 [145 Cal.Rptr. 368, 577 P.2d 188].)

The transferred intent rule for homicide was adopted in this state in *People* v. *Suesser, supra,* 142 Cal. 354. The court quoted from an encyclopedia which, examining the conflicting authorities regarding a victim who is killed "instead" of the one intended, stated, "The better doctrine is that a homicide so committed is as much murder in the first degree as it would have been had the fatal blow reached the person for whom intended. . . ." (*Id.,* at p. 366, quoting 21 American & English Encyclopedia of Law (2d ed.) p. 165.) The court then approved an instruction quoted from a Washington State case: "[W]here a person purposely and of his deliberate and premeditated malice attempts to kill one person, but by mistake or inadventure kills another instead, the law transfers the felonious intent from the object of his assault, and the homicide so committed is murder in the first degree." (*Id.,* at p. 367, quoting *State* v. *McGonigle* (1896) 14 Wash. 594 [45 P. 20].) As the use of "instead" and the references to "homicide" in the singular indicate, the *Suesser* court, like the authorities it drew on, had in

mind the assailant who misses the intended victim, and therefore cannot be prosecuted for the killing he intended. The transferred intent rule serves to ensure that he is punished to the full extent of his culpability.

Transferred intent is a legal fiction, used to reach what is regarded with virtual unanimity as a just result: when an assailant, through "bad aim" or other mistake, kills the wrong person, he is just as culpable, and should be punished to the same extent, as if he had hit the intended mark. (LaFave & Scott, Criminal Law (1972) § 35, p. 253.) Noting that the rule is "an unsound explanation [for] a very sound conclusion," the authors of another treatise argue that it should not apply at all to *attempted* homicides, as the assailant can be punished directly for an attempt on the intended victim: "If, without justification, excuse or mitigation D with intent to kill A fires a shot which misses A but unexpectedly inflicts a non-fatal injury upon B, D is guilty of an attempt to commit murder,—but the attempt was to murder A whom D was trying to kill and not B who was hit quite accidentally. And so far as the criminal law is concerned there is no transfer of this intent one to the other so as to make D guilty of an attempt to murder B." (Perkins & Boyce, Criminal Law (1982) § 8, pp. 924-925, fn. omitted.)

The purpose of the transferred intent rule—to ensure that prosecution and punishment accord with culpability—would not be served by convicting a defendant of two or more attempted murders for a single act by which he intended to kill only one person. In *People v. Birreuta, supra,* 162 Cal.App.3d at page 460, the court noted that there is a difference in culpability between an assailant who deliberately sets out to kill one person and in addition kills another accidentally, and one who deliberately kills two victims. Application of the transferred intent rule to the former would wipe out that distinction. Similarly, the attacker who shoots at two or more victims, with the intent of killing all, is more culpable than the one who aims at a single individual, even when the latter also injures a bystander. In the circumstances of this case, the transferred intent instruction obscured that difference.

The Attorney General attempts to distinguish *Birreuta* on the ground that the defendant there claimed he did not even know his wife was in the room. The defendant's ignorance that an unintended victim was present has sometimes been relied upon to show the inapplicability of transferred intent (*State v. Martin* (1938) 342 Mo. 1089 [119 S.W.2d 298, 300]; *State v. Gillette* (1985) 102 N.M. 695 [699 P.2d 626, 637], dis. opn. of Hendley, J.) But that fact played no part in *Birreuta's* rationale and does not suggest a different result here. That Czahara saw Johnson and knew he was present

was relevant in proving his actual mental state with respect to Johnson, but it does not make the disputed instruction correct.

We conclude that it was error to instruct the jury on transferred intent in this case. If Czahara aimed only at Christie, intending to kill only her, then he was attempting to kill only her. He was prosecuted and convicted of that attempt. There was no need to employ the legal fiction of transferred intent in order to fully punish him for the attempt. Again assuming that he had no intent to shoot Johnson, that shooting should be punished according to the culpability which the law assigns it, but no more. Czahara concedes on appeal, as he did at trial, that, transferred intent aside, he assaulted Johnson with a deadly weapon. California law also provides that maliciously firing into an occupied vehicle is itself a felony, punishable by up to seven years imprisonment. (Pen. Code, § 246.)

There may be cases of attempted murder where the instruction given here is applicable. Where an act intended to kill one person injures another but, for whatever reason, does not constitute an attempt on the intended victim's life, an instruction on transferred intent may be proper. But where a single act is alleged to be an attempt on two persons' lives, the intent to kill should be evaluated independently as to each victim, and the jury should not be instructed to transfer intent from one to another.

During deliberations, the jury asked the court whether or not the transferred intent rule applied to the allegations of intentional infliction of great bodily injury. The court answered that it did apply. The great bodily injury enhancements require the state to prove a specific intent to inflict injury. (Pen. Code, § 12022.7; *People* v. *Simpson* (1987) 192 Cal.App.3d 1360, 1365-1367 [237 Cal.Rptr. 910].) The court's answer to the jury's question was incorrect for the same reasons as was the transferred intent instruction on attempted murder.

The incorrect instructions allowed the jury to presume the intent to kill Johnson from the intent to kill Christie. ■ We must reverse unless we conclude that the error was harmless beyond a reasonable doubt. (See *People* v. *Lee* (1987) 43 Cal.3d 666, 674-676 [238 Cal.Rptr. 406, 738 P.2d 752] [beyond-a-reasonable-doubt standard applicable to attempted murder instructions which allowed jury to presume intent to kill from implied malice].)

We cannot say that the instructional error was harmless. While there was evidence of hostility between Czahara and Johnson which, together with the manner of the attack, would support an inference that Czahara intended to shoot both victims, the jury could easily have entertained a reasonable

doubt as to whether Czahara intended to shoot Johnson. Christie testified that the defendant aimed the first shot directly at her; there was no testimony showing at whom the second shot was aimed. Both Christie and Johnson testified that Czahara walked toward the driver's side of the car where Christie was seated. There was testimony that Czahara had threatened Christie in the past. The trial judge stated at sentencing that he was "not really sure" that Johnson was shot intentionally, and the jury's question to the court indicates that some jurors, at least, felt the need to rely on the transferred intent rule. The conviction for attempted murder of Johnson must therefore be reversed, as must the findings of intentional infliction of great bodily injury on Johnson.

## II

Czahara makes several claims of error regarding limitations placed on a defense psychiatric expert. There was no prejudicial error in these rulings.

Dr. Martin Blinder, a psychiatrist, examined Czahara and reviewed his history. He learned that Czahara had been orphaned at an early age and raised in a convent and in foster homes. Czahara had become excessively dependent on intimacy with women for validation of his self-worth, and was "exquisitely sensitive to rejection from women and with rejection would become very depressed, even abusive." Czahara told him that when he learned of Christie's infidelity and desire to end their romance he felt jealous rage and considered suicide. When he unexpectedly saw Christie pull up in front of Johnson's on September 19 he was filled with love, anger and rejection, and stopped thinking rationally.

Dr. Blinder concluded that Czahara was "addicted" to sexual intimacy, that a threatened cutoff of his "supply . . . precipitates profound agitation, which tends to short circuit his reason, his judgment. And I think it's while in the throes of this kind of emotional turmoil that he committed his near homicidal acts of 9 [sic] September 1986." Finally, defense counsel asked, "But for these emotional disorders, if that's what we want to call them, that you've described to us, would the events of September 19th have happened?" Dr. Blinder answered, "I think not, sir."

 Before Dr. Blinder testified, the court ruled he could not state an opinion as to whether Czahara acted under the heat of passion. Later, defense counsel made an offer of proof that the psychiatrist would have testified (1) that the defendant was acting in the heat of passion, and (2) that the ordinarily reasonable person in the same circumstances would also have acted in passion. The parties treat this offer as having been declined,

although there is no explicit ruling on the record. On appeal, Czahara contends that the offered proof was admissible.

Penal Code section 29 prohibits expert psychiatric testimony as to whether the defendant did or did not have a required mental state, including malice aforethought.[1] Czahara concedes that Dr. Blinder could not state an opinion that Czahara did not have the mental state required for attempted murder. But taken together, the two opinions offered from Dr. Blinder—that Czahara acted in the heat of passion and that his emotional reaction was objectively reasonable under the circumstances—completely negate malice aforethought and suffice to reduce intentional murder to voluntary manslaughter. ■ "If a killing, even though intentional, is shown to have been committed in a heat of passion upon sufficient provocation the absence of malice is presumed." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 719 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another point in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) ■ Heat of passion upon sufficient provocation is not merely evidence that malice was absent, it is by legal definition the absence of malice. To prove heat of passion and provocation is to prove that the defendant did not kill, or attempt to kill, with malice aforethought. The offered evidence as a whole was therefore properly excluded under Penal Code section 29. Nor was exclusion prejudicial error when the two components—the evidence of subjective passion and the evidence of objective reasonableness—are examined singly.

Czahara contends that Dr. Blinder should have been allowed to testify that the "ordinarily reasonable" person would have been provoked to an unreasoning passion by the events which occurred. The Attorney General counters that to allow such testimony would destroy the objective element of the heat of passion defense and permit the defendant to justify his acts by his own standard of conduct. (See *People* v. *Morse* (1969) 70 Cal.2d 711, 734-735 [76 Cal.Rptr. 391, 452 P.2d 607].)

The state's argument for exclusion does not meet the offer. Dr. Blinder was apparently prepared to testify that the ordinarily reasonable individual, not only one with Czahara's character disorders, would have reacted with irrational passion. Such evidence goes to the objective adequacy of the provocation, and does not result in substitution of a subjective standard for the objective.

---

[1] Section 29, passed in 1984 by supermajority votes in both legislative houses, is an exception to the "Truth-in-Evidence" provision of the California Constitution, article I, section 28, subdivision (d). (Stats. 1984, ch. 1433, § 4, p. 5030; see editor's note, Deering's Ann. Pen. Code, § 29 (1985 ed.) p. 103.)

However, psychiatric testimony on adequacy of provocation is inadmissible for a different reason: the adequacy of provocation is not a subject sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a).) Rather, the reasonableness of a reaction is left to the jurors precisely so that they may bring their common experience and their own values to bear on the question of whether the provocation partially excused the violence. To find the provocation adequate is to find that the defendant's behavior, while still reprehensible, is an understandable product of common human weakness, and therefore partly excusable. (See Comment, *Provoked Reason in Men and Women: Heat-of-Passion Manslaughter and Imperfect Self-Defense* (1986) 33 UCLA L.Rev. 1679.) While courts have frequently held certain categories of provocation adequate or inadequate as a matter of law, the modern tendency is to leave the jury free to apply community norms to the question. (LaFave & Scott, *op. cit. supra,* § 76, p. 574.)

Psychologists, psychiatrists or sociologists may have specialized empirical knowledge regarding the range of reactions to a given provocation, or the reaction of the statistically average individual in a given community. But this information would not materially assist the jury in its task; the jury must determine not only if the reaction is ordinary but if it is reasonable, and that determination depends more on (perhaps unarticulated) community norms than on empirically discoverable averages.

■ Czahara also complains that Dr. Blinder was not permitted to use the term "heat of passion" in describing Czahara's state of mind on September 19. We need not decide whether that restriction was correct under Penal Code section 29. Dr. Blinder testified to the "profound agitation" and "emotional turmoil" which "short circuited" Czahara's reason and judgment on September 19. The jury was instructed that heat of passion was a state in which "judgment give[s] way to impulse and rashness . . . ." Thus, Dr. Blinder's conclusions were in terms which directly related to the issue before the jury, and it is not reasonably probable that a different verdict would have resulted had the psychiatrist been permitted to use the label "heat of passion."

Finally, Czahara claims that Dr. Blinder was improperly prevented from testifying that Czahara's emotional state *caused* him to act as he did. This claim is not supported by the record, which shows that Dr. Blinder testified that the events would not have occurred but for Czahara's emotional disorders.

The conviction for attempted murder of Ronald Johnson (count three) is reversed, as is the finding of intentional infliction of great bodily injury in

the assault on Johnson (count four). The cause is remanded for resentencing, and for possible retrial of count three and the great bodily injury allegations in counts three and four. (See *People* v. *Mariano* (1983) 144 Cal.App.3d 814, 819-820 [193 Cal.Rptr. 47].) The judgment is otherwise affirmed.

King, J., and Haning, J., concurred.