**The PEOPLE OF the TERRITORY OF GUAM, Plaintiff–Appellee,**

v.

**Richard Reyes QUICHOCHO, Defendant–Appellant.**

**No. 91–10333.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 5, 1992.

Decided Aug. 19, 1992.

Randall Todd Thompson, Mair, Mair, Spade & Thompson, Agana, Guam, for defendant-appellant.

J. Andrew Artero–Boname, Asst. Atty. Gen., Agana, Guam, for plaintiff-appellee.

Before HALL, BRUNETTI, and LEAVY, Circuit Judges.

## ORDER

The memorandum disposition filed June 18, 1992, is redesignated as an authored opinion by Judge Hall.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge:

Appellant Richard Reyes Quichocho was indicted in Guam Superior Court on one count of aggravated murder, seven counts of attempted aggravated murder, one count of possession and use of a deadly weapon in the commission of a felony, and two counts of theft by receiving stolen property. Quichocho pled not guilty by reason of mental illness. On August 3, 1990, a jury found Quichocho guilty on all counts, except that on six of the attempted aggravated murder counts it found Quichocho guilty of the lesser included offense of attempted murder. Quichocho was sentenced to a prison term of life plus eighty-five years. The District Court of Guam, Appellate Division, upheld the convictions and sentence.

The Superior Court of Guam had original jurisdiction under section 22A of the Organic Act of Guam, 48 U.S.C. § 1424–1. The District Court of Guam, Appellate Division, had appellate jurisdiction pursuant to 48 U.S.C. § 1424–3(a). This court has jurisdiction pursuant to 28 U.S.C. § 1291 and 48 U.S.C. § 1424–3(c). We affirm Quichocho's convictions on all counts.

### I

### FACTS

Distraught by his estrangement from his girlfriend Bobbie Quichocho, Appellant Richard Quichocho (the common last name is apparently coincidence) told Bobbie, "If I can't have you, then nobody will." This was no idle threat, for soon afterwards Quichocho began to stalk Bobbie. Armed with a 9mm semi-automatic rifle and police

radio, and dressed in a black trench coat, maroon ski mask, and surgical gloves, Quichocho made his first attempt on Bobbie's life on May 20, 1989, when he fired a single shot at a group of three teenage girls, one of whom he mistook for Bobbie. On that occasion, no one was injured. But five days later, several rounds of ammunition Quichocho fired into a Merizo, Guam home in which Bobbie was staying, struck and killed sixteen year-old Melanie Cruz. Quichocho was tried and convicted for the murder of Melanie Cruz and the attempted murders of the three girls and the four men and women, including Bobbie, who were staying in the Merizo home the evening Melanie Cruz was killed.

## II

## THE MANSLAUGHTER DEFENSE

■ Quichocho first argues that the trial court erred in instructing the jury on manslaughter. Quichocho's defense at trial was that he committed the homicide for which he was charged while acting under an extreme mental or emotional disturbance. Under Guam law, murder committed under an extreme mental or emotional disturbance will be mitigated to manslaughter. *See* 9 GCA § 16.50(a). Quichocho argues that by instructing the jury to follow verdict forms that required it to reach a verdict on murder before considering manslaughter, and by refusing to instruct the jury that murder and manslaughter should be considered contemporaneously, the judge prevented the jury from effectively considering his manslaughter defense.

The problem with Quichocho's argument is that he was convicted of *aggravated* murder, and under Guam law, the existence of an "extreme mental and emotional disturbance" is not a defense to aggravated murder. 9 GCA § 16.50(a) states:

Criminal homicide constitutes manslaughter when:

(1) it is committed recklessly; or

(2) a homicide which would otherwise be *murder* is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse.

(emphasis added). The plain language of § 16.50 indicates that an extreme mental or emotional disturbance mitigates murder to manslaughter. It does not mitigate aggravated murder.[1]

Our examination of Model Penal Code § 210.3, upon which section 16.50 was based, also indicates that an "extreme mental and emotional disturbance" will not mitigate aggravated murder to manslaughter. The comment to section 210.3 explains that "extreme mental and emotional disturbance" is a modified version of the traditional notion of "passion and provocation" that takes into account the actor's subjective state of mind. *See* Model Penal Code § 210.3, Commentary at 62–64 (Proposed Official Draft 1963). The commentary also indicates that "extreme mental and emotional disturbance" does not include the concept of "diminished responsibility," as that concept has been employed by some courts, particularly in California. *Id.* at 65–72. Evidence of a mental defect may negate the mental state of intent, but "where such intent is shown, reduction of the crime to manslaughter may be accomplished only under the modified rule of provocation stated in Section 210.3(1)(b)." Model Penal Code § 210.3, Commentary at 72. Like common law "passion and provocation," the Model Penal Code notion of "extreme mental and emotional disturbance" is entirely at odds with premeditation and deliberation. It presupposes a degree of emotional agitation, akin to that presumed by "passion and provocation," that is inconsistent with premeditation.

Therefore, once the jury found that the premeditation and deliberation elements of aggravated murder had been satisfied, it

---

**1.** Quichocho argues that 9 GCA § 16.50 does not mention the term aggravated murder because there was no such crime when 9 Guam Code Annotated Chapter 16 was first enacted. This argument is not persuasive because the sections defining aggravated murder, murder, and manslaughter, 9 GCA §§ 16.20, 16.30, 16.40, and 16.50, were all repealed and reenacted as a package on December 31, 1982. *See* Guam Pub.L. No. 16–126.

could not have found that Quichocho had acted under an extreme mental or emotional disturbance, and had no reason to consider the question.[2]

## III

### THE PROSECUTOR'S REMARKS

Quichocho argues that during closing argument, the prosecutor made two types of improper comments. First, the prosecutor referred to the existence of a criminal record not admitted into evidence at trial. Second, the prosecutor requested that the jury convict Quichocho based on the jury's "law enforcement" role. Quichocho contends that each of these errors requires reversal.

#### A. Existence of an Arrest Record

During closing argument, defense counsel stated:

> And what do you find from the evidence and the background of Richard? Fairly normal existence. High school graduate, honorably discharged from the Army, became a policeman, etcetera, etcetera. Violence was not a part of his life. He was not what they call a sociopath ... [W]hat in this man's background and his history, *arrest records*, convictions, thefts, burglaries, crimes, what in his background would explain what he did? And the evidence is nothing.

(emphasis added). The prosecutor made the following comments in response:

> Now, you know, Mr. Hogan goes on and on about this once so perfect guy who turned whatever and killed somebody. And he says, 'Well what is it in his background? What is it? *The prosecution hasn't brought an arrest record. The prosecution hasn't brought in this*

*information.'* Mr. Hogan knows I can't do that. I'm not allowed to do that. (emphasis added).

Quichocho claims that the prosecutor's comments were improper because they falsely suggested that Quichocho had an arrest record when he did not. In the alternative, Quichocho states that even if Quichocho did have an arrest record, the remarks were still improper because the prosecution may not say anything to the jury implying that evidence exists but has not been admitted into evidence. *See United States v. Morris*, 568 F.2d 396, 401 (5th Cir.1978). Quichocho further argues that the remarks were prejudicial and require reversal because they suggested involvement in prior crimes, which discredited the thrust of the defense.

A prosecutor's remarks in closing argument are reviewed for plain error in the absence of an objection by defense counsel. *United States v. Young*, 470 U.S. 1, 6, 105 S.Ct. 1038, 1041, 84 L.Ed.2d 1 (1985). This court is authorized to correct only "particularly egregious errors" that affect the "fairness, integrity or public reputation of judicial proceedings." *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982); *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). Here, Quichocho failed to object to the prosecutor's comments and we must therefore determine whether those comments were "particularly egregious" under the *Frady/Atkinson* plain error standard.[3] We conclude that because the comments were "invited" by defense counsel, they were not plain error.

In *Young*, the Supreme Court held that a defense counsel's conduct is relevant to the plain error analysis if it "invited" the prosecutor's response.

---

**2.** Quichocho argues that the court's failure to instruct the jury on the meaning of "extreme mental and emotional disturbance" requires reversal. Because we hold that the jury's conviction of Quichocho for aggravated murder could not have been affected by a consideration of manslaughter, we need not consider this question.

**3.** Though Quichocho claims that counsel were prohibited by the court from raising objections during the course of closing argument, the trial transcript indicates otherwise. The trial judge informed counsel on two occasions that they had the opportunity to object to portions of closing argument.

[T]he issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant. In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction.

470 U.S. at 12–13, 105 S.Ct. at 1045. *See also United States v. Gwaltney*, 790 F.2d 1378 (9th Cir.1986), *cert. denied*, 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987). Here, defense counsel's comments concerning the non-existence of character evidence, including any arrest record, invited the response by the prosecution that he had not been allowed to introduce any such evidence. Taken in context, the comment did not unfairly prejudice Quichocho. Instead of falsely implying to the jury that a specific arrest record existed, the prosecution's comment merely rebutted defense counsel's suggestion that the reason the government failed to introduce negative character evidence is that none existed.

### B. Conviction for Public Policy Reasons

█ Quichocho next argues that the prosecutor improperly encouraged the jury to convict by referring to its "law enforcement" role. The prosecutor stated:

And I ask each and everyone [sic] of you to send a message because this defendant is a true killer.

＊　＊　＊　＊　＊　＊

I'm asking you on behalf of the people to return a verdict of guilty because you are truly the final law enforcers in our community. You know, *all these parents of murdered children, all these groups for victims, they don't mean a thing in our community unless we, unless you, you are the conscience of our community*, unless you send a message to the defendant, to this defendant and to

all those out there in our community, that if you're going to live on our island, you're going to follow our laws. And if you don't follow our laws, Ladies and Gentlemen of the jury, then you will be held accountable to the fullest extent of the law.

(emphasis added).

█ Appeals to the jury to act as a conscience of the community are not impermissible unless they are specifically designed to inflame the jury. *See United States v. Kopituk*, 690 F.2d 1289, 1342–43 (11th Cir. 1982), *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). In *United States v. Lester*, 749 F.2d 1288 (9th Cir. 1984), a case involving a conspiracy to prevent a witness from testifying in a federal narcotics prosecution, we held that a prosecutor's statements to the jury that "we are all victims" and that an acquittal would be a message to the defendant that he could stop people from talking to the FBI did not "cross the line 'demarcating permissible oratorical flourish from impermissible comment calculated to incite the jury against the accused.'" *Id.* at 1301 (quoting *Kopituk*, 690 F.2d at 1342–43).

Here, the prosecutor's reference to "murdered children," in conjunction with his plea that the jury act as the conscience of the community, at least approaches the line we described in *Lester*. The remark could have prejudiced the jury by directing its attention towards unspecified crimes with which the defendant was not charged. For this reason, we find the prosecutor's comments troubling. Nevertheless, the comments were not extensive and the evidence against Quichocho was substantial. Furthermore, the court instructed the jury to focus solely on the evidence presented. Under the circumstances, we believe the remark was harmless beyond a reasonable doubt.

### IV

### TRANSFERRED INTENT

### A

█ Quichocho argues that his conviction should be reversed because the California jury instruction the jury received on

the doctrine of "transferred intent" did not accurately convey Guam law. Quichocho claims that the law of transferred intent stated in California Jury Instruction (CALJIC) 8.65 is materially different from the Guam law of transferred intent. We have held that an instruction that differs markedly from one set forth in the Guam Code is acceptable if it "adequately conveys the meaning embodied in the statute, and pays sufficient respect to the judgment of the Guam legislature." *People of the Territory of Guam v. Yang*, 850 F.2d 507, 512 (9th Cir.1988).

Quichocho argues that California law imposes greater liability than Guam law on a defendant who kills an unintended victim. CALJIC 8.65 explicitly states that when the only difference between the result intended by the defendant and the actual result is that the wrong victim dies, the jury should find the defendant guilty to the same extent as if he had killed his intended victim.[4] The Guam transferred intent statute, on the other hand, does not say that a defendant who kills an unintended victim is guilty of the same crime, but rather that he shall not be "relieved of responsibility."[5] Quichocho makes much of this alleged difference between California and Guam law. He contends that under the Guam statute, the "premeditation and deliberation" element of aggravated murder cannot be transferred, and that he therefore should have been found guilty not of aggravated murder, but rather of murder and aggrava-

ted attempted murder. Quichocho cites no authority for these assertions.

Quichocho's interpretation of section 4.50(b) conflicts with the most basic precepts of the criminal law, as well as with the plain terms of the statute. First, if section 4.50(b) means what Quichocho says it means, the culpability of the most calculating and brutal killer could be ignored if he happened to accidentally hit the wrong target. Second, the plain language of section 4.50 reveals that it is premised on the view that criminal offenses should be defined in terms of culpability, rather than in terms of actual causation.[6] Subsection (a) imposes liability for a crime if the offender directly caused the outcome and possessed the requisite mental state. Subsection (b) provides that when "the only difference between what actually occurred and what was designed" was that the wrong person was injured, subsection (a) is satisfied and the defendant is liable to the same extent as if the intended victim had been injured. The comment to 9 GCA 4.50(b) explains:

> The Model Penal Code proceeds upon the view that problems of this kind (causation) ought to be faced as problems of the culpability required for conviction and not as problems of "causation." (Model Penal Code, tentative draft No. 4, 132).

This Section then defines very clearly when a defendant is deemed to have caused, and is thus culpable for, an act which is a crime....

**4.** CALJIC 8.65 states:
> When one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed had been killed.

**5.** 9 GCA § 4.50(b) states:
> A defendant shall not be relieved of responsibility for causing a result if the only difference between what actually occurred and what was designed, contemplated or risked is that a different person, or property was injured or affected or that a less serious or less extensive injury or harm occurred.

**6.** 9 GCA § 4.50 states:
> "Causation Established and Defined.
> (a) An element of an offense which requires that the defendant have caused a particular result is established when his conduct is an

antecedent but for which the result would not have occurred, and,
> (1) if the offense requires that the defendant intentionally or knowingly caused the result, that the actual result, as it occurred,
> (A) is within the purpose or contemplation of the defendant, whether the purpose or contemplation extends to natural events or to the conduct of another, or, if not,
> (B) involves the same kind of injury or harm as that designed or contemplated and is not too remote, accidental in its occurrence or dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his offense....
> (b) A defendant shall not be relieved of responsibility for causing a result if the only difference between what actually occurred and what was designed, contemplated or risked is that a different person or property was injured or affected...."

It will be noted that in virtually all cases to which [section 4.50] would be applicable the defendant would be guilty of some crime, since in each case the defendant would have intended or contemplated the infliction of injury or harm. *Whether or not the causal relationship is established is generally determinative therefore, not of the issue criminal liability [sic], but of whether the defendant should be liable of for [sic] the greater crime requiring production of the result.*

(emphasis added). Section 4.50, therefore, requires that the offense with which an individual is charged be determined by his culpability, not by the result he causes, so long as the actual result is not too remote from the intended result. Subsection (b) states that when the only difference between the two results is that the offender injures the wrong victim, the actual result is by definition not too remote from the intended result.

This interpretation of section 4.50 is supported by the commentary to Model Penal Code section 2.03, upon which section 4.50 was based. *See* Model Penal Code § 2.03, Explanatory Note (Proposed Official Draft 1963) ("If the divergence [between the actual and contemplated result] is only that a different person or property is affected ... the difference is declared to be legally immaterial.").

We hold that CALJIC 8.65 does not differ materially from 9 GCA § 4.50(b) and was correctly administered.

### B

■ Quichocho next argues that, even assuming that CALJIC 8.65 properly states the doctrine of transferred intent under Guam law, the jury erroneously applied the doctrine by convicting Quichocho of one count of attempted aggravated murder and six counts of attempted murder.

Quichocho cites as authority *People v. Czahara,* 203 Cal.App.3d 1468, 250 Cal.

Rptr. 836 (1988), in which the defendant was convicted for the attempted murder of his girlfriend and her lover after he shot and injured them both while they sat in the front seat of her car. The court delivered a modified version of CALJIC 8.65 that permitted the jury to apply the transferred intent doctrine to find the defendant guilty of the attempted murder of the lover, even if it concluded that he had only intended to kill the girlfriend. Czahara argued that the instruction was inappropriate because the intended victim was injured in the attempt. The court agreed: "Where a single act is alleged to be an attempt on two persons' lives, the intent to kill should be evaluated independently as to each victim, and the jury should not be instructed to transfer intent from one to another." *Id.* 250 Cal.Rptr. at 840. The court reasoned that the "purpose of the transferred intent rule—to ensure that prosecution and punishment accord with culpability—would not be served by convicting a defendant of two or more attempted murders for a single act by which he intended to kill only one person." *Id.* 250 Cal.Rptr. at 839.

Quichocho relies on *Czahara* to argue that the instruction on transferred intent caused him to be improperly convicted for attempted aggravated murder and attempted murder, because he had no intent to injure or kill the individuals who were the subject of these counts. But *Czahara* does not apply here, because in this case the court gave no transferred intent instruction with respect to the seven attempted murder victims. By its own terms, the "transferred intent" instruction was limited to the aggravated murder count.[7] Quichocho's response, that the instruction was not limited to the aggravated murder count because the court did not explicitly state that limitation, is not persuasive.

### V

### DEFINITION OF FELONY

■ Quichocho argues his conviction of one count of possession and use of a deadly

---

7. Quichocho's assertion that the court did not so limit the "transferred intent" instruction is incorrect. The court instructed the jury: "When one attempts to kill a certain person, but by mistake or inadvertence *kills* a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed." (emphasis added).

weapon in the commission of a felony—the aggravated murder of Melanie Cruz—in violation of 9 GCA § 80.37 should be reversed because no evidence was introduced and no jury instruction was given as to what constitutes a "felony." Quichocho cites *People v. Allison*, 245 Cal.App.2d 568, 54 Cal.Rptr. 148 (1966), in which the court held that the failure to define "felony" was reversible error. *Id.* 54 Cal.Rptr. at 153. The court stated, "This is not a matter of common knowledge, but is a matter which requires that the jury be clearly and fully instructed." *Id.* In this case, the court's failure to define "felony" was not an error. The crime of "aggravated murder" was obviously a felony and the jury did not need to be so instructed. In any case, we can be certain that had "felony" been defined for the jury, it would have found that "aggravated murder" fell under its rubric, and thus any error was harmless.

## VI

### CUMULATIVE EFFECT OF ERRORS

Finally, Quichocho argues that the cumulative effect of the trial errors in this case requires reversal. *See United States v. Vargas*, 583 F.2d 380, 387–88 (7th Cir. 1978); *United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir.1978). The foregoing analysis demonstrates that the only errors in this case were the prosecutors' remarks to the jury. Neither amounts to plain error by itself, and they do not become more prejudicial when considered together.

Appellant's convictions are AFFIRMED.