[No. S048572. Dec. 19, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
DAMIEN SCOTT et al., Defendants and Appellants.

**COUNSEL**

Gordon S. Brownell and Robert E. Boyce, under appointments by the Supreme Court, and Laura Schaefer for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson and Sharon Wooden Richard, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROWN, J.**—A jury convicted defendants Damien Scott and Derrick Brown of various crimes for their part in a drive-by shooting which resulted

in the death of one person and injury to several others. We must decide in this case whether the doctrine of transferred intent may be used to assign criminal liability to a defendant who kills an unintended victim when the defendant is also prosecuted for the attempted murder of an intended victim.

Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had " 'the fatal blow reached the person for whom intended.' " (*People* v. *Suesser* (1904) 142 Cal. 354, 366 [75 P. 1093] (hereafter *Suesser*).) In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.

Here, it was established at trial that defendants fired an automatic weapon into a public park in an attempt to kill a certain individual, and fatally shot a bystander instead. The case presents the type of factual setting in which courts have uniformly approved reliance on the transferred intent doctrine as the basis of determining a defendant's criminal liability for the death of an unintended victim. Consistent with a line of decisions beginning with *Suesser* nearly a century ago, we conclude that the jury in this case was properly instructed on a transferred intent theory of liability for first degree murder.

Moreover, defendants' exposure to a murder conviction based on a transferred intent theory of liability was proper regardless of the fact they were also charged with attempted murder of the intended victim. Contrary to what its name implies, the transferred intent doctrine does not refer to any actual intent that is "used up" once it has been employed to convict a defendant of a specific intent crime against an intended victim. Rather, the doctrine of transferred intent connotes a policy. As applied here, the transferred intent doctrine is but another way of saying that a defendant who shoots with an intent to kill but misses and hits a bystander instead should be punished for a crime of the same seriousness as the one he tried to commit against his intended victim.

In this case, defendants shot at an intended victim, missed him, and killed another person instead. In doing so, defendants committed crimes against two persons. Defendants' criminal liability for causing the death of the unintended victim may be determined on a theory of transferred intent in accordance with the classic formulation of the doctrine under California common law. Their criminal liability for shooting at the intended victim with an intent to kill is that which the law assigns.

The Court of Appeal correctly concluded that the trial court's instruction to the jury on transferred intent as it related to the charge of murder was

proper. We affirm the judgment of the Court of Appeal affirming, with minor modification, the judgments of conviction.

## I. Background

In May 1991, Calvin Hughes became the target of a family vendetta. While Hughes and Elaine Scott were romantically involved, Hughes and his sister, Eugenia Griffin, shared Scott's apartment. After the bloom faded from the romance, relations between Hughes and Scott became increasingly acrimonious and one night Hughes and Scott got into a physical altercation. Defendant Damien Scott and codefendant Derrick Brown, Scott's adult sons, came to her aid and forced Hughes and Griffin out of the apartment.

A few days later, Hughes borrowed Griffin's car and, accompanied by his friend Gary Tripp, returned to Scott's place to retrieve his personal belongings. When Scott attempted to bar his entry, Hughes forced his way into the apartment and gathered his things. On his way out, he heard Scott threaten to page her sons.

Hughes and Tripp drove to Jesse Owens Park in South Los Angeles to meet Griffin. Nathan Kelley and his teenage son, Jack Gibson, had parked nearby. As Hughes stood beside Kelley's car, talking to him through the open window, three cars entered the park. Gunfire erupted. Defendant Scott and codefendant Brown, riding in the first car, sprayed the area with bullets. Hughes took cover behind the front bumper of Kelley's car. When there was a lull in the shooting, Hughes sprinted toward the park gym. A renewed hail of gunfire followed him. A bullet hit the heel of his shoe. The shooting stopped when Hughes took cover behind the gym. The gunmen left the park.

In the aftermath, the victims discovered both Kelley's and Griffin's vehicles had been riddled with bullets; Gary Tripp had been shot in the leg and buttocks; and Jack Gibson had been killed when a bullet struck him in the head.

In an amended multicount information, defendant Scott and codefendant Brown were jointly charged with the murder of Jack Gibson (Pen. Code, § 187, subd. (a); all further statutory references are to this code); attempted murder of Calvin Hughes and Gary Tripp (§§ 664, 187, subd. (a));[1] and assault with a firearm on Calvin Hughes, Nathan Kelley, Gary Tripp, and Eugenia Griffin. (§ 245, subd. (a)(2).) As to each count, the information

---

[1]The information did not allege that the attempted murders were willful, deliberate, and premeditated for sentence enhancement purposes. (See *People* v. *Bright* (1996) 12 Cal.4th 652, 669 [49 Cal.Rptr.2d 732, 909 P.2d 1354].)

alleged defendants personally used a firearm within the meaning of section 12022.5, subdivision (a)(1). It was further alleged, as to the murder and attempted murder counts, that defendants were armed with a firearm within the meaning of section 12022, subdivision (a)(1).

At a second trial following mistrial due to a deadlocked jury, the prosecutor sought to establish that Jack Gibson was the unintended victim of defendants' premeditated and deliberate intent to kill Calvin Hughes. At the prosecution's request, the trial court instructed the jury on transferred intent using a modified version of CALJIC No. 8.65. The court stated as follows: "As it relates to the charge of murder, where one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed." The jury was also instructed on second degree express malice and implied malice murder.

The jury convicted both defendants of second degree murder, two counts of attempted murder, and two counts of assault with a firearm. It found true all of the firearm allegations. The jury acquitted defendants of two counts of assault with a firearm that had been charged in the alternative to the counts of attempted murder.

Defendants appealed their convictions and, in a published decision, the Court of Appeal modified and affirmed the judgments of conviction. In relevant part, the Court of Appeal rejected defendants' argument that a transferred intent instruction only applies when the prosecution elects to charge the defendant with first degree murder of the unintended victim, and not also with attempted murder of the intended victim.

We granted defendant Scott's petition for review.

The jury convicted defendants of second degree murder for fatally shooting the unintended victim. It cannot be determined from the verdicts, however, whether the jury relied on the transferred intent instruction to convict defendants of second degree murder on an express malice theory, or whether it reached that verdict through a finding of implied malice. Consequently, it is necessary to decide whether a transferred intent instruction was properly given in this case.

## II. Discussion

The common law doctrine of transferred intent was applied in England as early as the 16th century. (See *The Queen* v. *Saunders & Archer* (1576) 75

Eng.Rep. 706, 708 ["And when death followed from his act, although it happened in another person than her whose death he directly meditated, yet it shall be murder in him . . . ."].) The doctrine became part of the common law in many American jurisdictions, including that of California, and is typically invoked in the criminal law context when assigning criminal liability to a defendant who attempts to kill one person but accidentally kills another instead. (See 1 LaFave & Scott, Substantive Criminal Law (1986) § 3.12(d), p. 399; Perkins & Boyce, Criminal Law (3d ed. 1982) § 8, p. 921, fn. 1.) Under such circumstances, the accused is deemed as culpable, and society is harmed as much, as if the defendant had accomplished what he had initially intended, and justice is achieved by punishing the defendant for a crime of the same seriousness as the one he tried to commit against his intended victim. (*Gladden* v. *State* (1974) 273 Md. 383 [330 A.2d 176, 188]; *People* v. *Czahara* (1988) 203 Cal.App.3d 1468, 1474 [250 Cal.Rptr. 836] (hereafter *Czahara*) [doctrine of transferred intent used to reach what is uniformly regarded as just result]; see also Ritz, *Felony Murder, Transferred Intent, and the Palsgraf Doctrine in the Criminal Law* (1959) 16 Wash. & Lee L.Rev. 169, 171.) Under the classic formulation of the common law doctrine of transferred intent, the defendant's guilt is thus "exactly what it would have been had the blow fallen upon the intended victim instead of the bystander." (40 Am.Jur.2d, Homicide, § 11, p. 302; see also *State* v. *Clark* (1898) 147 Mo. 20 [47 S.W. 886, 888] [indictment should be drawn as though decedent was person at whom shot was fired]; see also 4 Blackstone, Commentaries 201.)

In California, the transferred intent doctrine was first addressed in *Suesser*, *supra*, 142 Cal. 354. The defendant in that case was convicted of first degree murder and sentenced to death for fatally shooting an individual under the erroneous belief he was firing at a different person named Allen, whom the defendant deliberately and with premeditation intended to kill. (*Id.* at p. 365.) On appeal, the defendant argued the trial court erred in refusing his request to instruct the jury that malice must exist towards the person actually killed, and that if the defendant shot the deceased erroneously believing him to be Allen, he was guilty of only second degree murder. The trial court instructed instead in accordance with the common law doctrine of transferred intent, explaining to the jury that the defendant was guilty of the same degree of murder as if he had killed Allen instead of the deceased. (*Ibid.*)

Persuaded by the reasoning of commentators and the weight of authority from other jurisdictions, *Suesser* held that the common law doctrine of transferred intent survived the enactment of California's murder statute. (*Suesser*, *supra*, 142 Cal. at pp. 366-367.) The opinion in *Suesser* does not expressly state the rationale behind the rule of transferred intent. One of the

out-of-state decisions cited by the *Suesser* court did so succinctly, however. In *State* v. *Murray* (1884) 11 Or. 413 [5 P. 55], the defendant was convicted of first degree murder for killing a bystander in an attempt on the life of another person. The Oregon Supreme Court affirmed the judgment because the defendant "exhibited the same malignity and recklessness in the one event he would have displayed in the other, and the consequences to society are just as fearful." (*Id.* at p. 60.)

*Suesser, supra,* 142 Cal. 354, and a number of other California decisions present the classic "bad aim" cases in which a defendant who attempts to kill one individual and inadvertently kills a bystander instead is convicted of murder on the theory of transferred intent. Courts in these cases have uniformly rejected the defendants' argument that their convictions were based on insufficient evidence of intent to kill. (See *People* v. *Sutic* (1953) 41 Cal.2d 483, 491-492 [261 P.2d 241] [first degree murder of child inadvertently killed in dispute over egg bill]; *People* v. *Clayton* (1967) 248 Cal.App.2d 345, 349 [56 Cal.Rptr. 413] [second degree murder of bystander killed in racially motivated attempt on life of pedestrian]; *People* v. *Walker* (1946) 76 Cal.App.2d 10, 14 [172 P.2d 380] [first degree murder of bystander killed inadvertently when pool hall argument escalated into violence].) ▮ Here, the evidence adduced at trial indicates that defendants shot at an intended victim, missed him, and killed another person instead. Consistently with *Suesser* and its progeny, we conclude that in light of this evidence, the trial court properly instructed the jury according to CALJIC No. 8.65 that "[w]hen one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed."

Nor is application of the transferred intent doctrine under these circumstances foreclosed by the prosecutor having charged defendants with attempted murder of the intended victim. Contrary to what its name implies, the transferred intent doctrine does not refer to any actual intent that is capable of being "used up" once it is employed to convict a defendant of a specific intent crime against the intended victim.

Courts and commentators have long recognized that the notion of creating a whole crime by "transferring" a defendant's intent from the object of his assault to the victim of his criminal act is, as Dean Prosser aptly describes it, a "bare-faced" legal fiction. (Prosser, *Transferred Intent* (1967) 45 Tex. L.Rev. 650, 650; see *Czahara, supra,* 203 Cal.App.3d at p. 1474; see also Husak, *Transferred Intent* (1996) 10 Notre Dame J.L., Ethics & Pub. Pol'y 65, 83-86; Ritz, *Felony Murder, Transferred Intent, and the Palsgraf Doctrine*

*in the Criminal Law, supra*, 16 Wash. & Lee L.Rev. at p. 171; *People* v. *Calderon* (1991) 232 Cal.App.3d 930, 935 [283 Cal.Rptr. 833] (hereafter *Calderon*).) The legal fiction of transferring a defendant's intent helps illustrate why, as a theoretical matter, a defendant can be convicted of murder when she did not intend to kill the person *actually killed*. The transferred intent doctrine does not, however, denote an actual "transfer" of "intent" from the intended victim to the unintended victim. (Cf. Prosser, *Transferred Intent, supra*, at p. 653.) Rather, as applied here, it connotes a *policy*—that a defendant who shoots at an intended victim with intent to kill but misses and hits a bystander instead should be subject to the same criminal liability that would have been imposed had he hit his intended mark. (Hall, General Principles of Criminal Law (2d ed. 1960) p. 145.) It is the policy underlying the doctrine, rather than its literal meaning, that compels the conclusion that a transferred intent instruction was properly given in this case.

Conversely, reliance on a transferred intent theory of liability for the first degree murder of the unintended victim did not prevent the prosecutor from also charging defendants with attempted murder of the intended victim. As previously recounted, defendants shot at an intended victim, missed him, and killed another individual instead. In their attempt to kill the intended victim, defendants committed crimes against two persons. They may be held accountable for the death of the unintended victim on a theory of transferred intent. Their criminal liability for attempting to kill the intended victim is that which the law assigns, here, in accordance with the attempted murder statute, sections 664 and 187, subdivision (a).

Defendant Scott argues that when an accused is charged with attempted murder of the intended victim, and transferred intent is used to assign a defendant's liability for the killing of an unintended victim, the defendant is being prosecuted as if he intended to kill two people rather than one. Defendant asserts that, under these circumstances, transferred intent should not be applied. He finds support for this proposition in *People* v. *Birreuta* (1984) 162 Cal.App.3d 454 [208 Cal.Rptr. 635] (hereafter *Birreuta*), where the court stated that a murderer who premeditates and deliberates two killings is more culpable, and should be punished more severely, than the murderer who intends to kill only one victim and inadvertently kills another. (*Id.* at pp. 460-461; see also *Czahara, supra*, 203 Cal.App.3d at p. 1474 [noting application of transferred intent resulted in defendant being punished in same manner as if he actually intended to kill both victims]; *Calderon, supra*, 232 Cal.App.3d at p. 937 [same].)

In *Birreuta, supra*, 162 Cal.App.3d 454, the defendant was convicted of two counts of first degree murder for fatally shooting both an intended and

an unintended victim. The court reversed the conviction that was based on the theory of transferred intent, holding that when the intended victim is killed, it is unnecessary to rely on the fiction of transferred intent. According to the court, the defendant's premeditation and deliberation can be directly and fully employed in prosecuting the first degree murder of the intended victim. (*Id.* at p. 460.)

The *Birreuta* court viewed killers who premeditatedly and deliberately kill two people as more culpable than those who only intend to kill one person and mistakenly kill another in the attempt. The court noted that when the transferred intent doctrine is applied to hold the latter accountable for the accidental killing as a first degree murder, this distinction in culpability disappears. (*Birreuta, supra,* 162 Cal.App.3d at p. 460.)

We observe that although application of the transferred intent doctrine in the classic bad aim cases has been consistent, in cases involving crimes relating to both intended and unintended victims, reliance on the doctrine to assign criminal liability has led to mixed results. Some courts simply apply the rule of *Suesser* without addressing the question whether the death of, or injury to, the intended as well as the unintended victim requires a different analysis. (See, e.g., *People* v. *Leslie* (1964) 224 Cal.App.2d 694, 704 [36 Cal.Rptr. 915] [second degree murder of unintended victim via transferred intent; assault with intent to commit murder of intended victim]; *People* v. *Pivaroff* (1934) 138 Cal.App. 625, 628 [33 P.2d 44] [first degree murder of unintended victim on transferred intent theory; assault with intent to commit murder on intended victim].) Other courts acknowledge the potential for analytical distinctions but reach conflicting resolutions. The court in *People* v. *Carlson* (1974) 37 Cal.App.3d 349 [112 Cal.Rptr. 321] stated, in dictum, that transferred intent "applies even though the original object of the assault is killed as well as the person whose death was the accidental or the unintended result of the intent to kill the former." (*Id.* at p. 357.) The court in *Birreuta, supra,* 162 Cal.App.3d 454, expressed a contrary view, holding the transferred intent doctrine did not apply when both intended and unintended victims are killed. (*Id.* at pp. 460-461; cf. *Calderon, supra,* 232 Cal.App.3d at pp. 936-937 [under reasoning of *Birreuta,* transferred intent inapplicable when single act alleged to be attempt on two lives]; *Czahara, supra,* 203 Cal.App.3d at p. 1474 [same].)

Because the facts of the case presented here do not involve the fatal shooting of both an intended and unintended victim, we have no occasion to determine whether *Birreuta*'s reasoning or its conclusion is correct, and we decline to express a view on that decision. As previously discussed, the evidence at trial in this case was that defendants' attempt to kill one person

resulted in the killing of an innocent bystander. Under these circumstances, *Suesser* and its progeny have uniformly applied the common law doctrine of transferred intent to assign a defendant's criminal liability for the killing of the unintended victim. Consistent with the line of decisions beginning with *Suesser* nearly a century ago, because defendants shot at one person with an intent to kill, missed him, and killed a bystander instead, they may be held accountable for a crime of the same seriousness as the one they would have committed had they hit their intended target.

Defendant Scott raises two additional arguments. He contends first the trial court erred by instructing the jury the transferred intent doctrine applied to the charge of attempted murder of Gary Tripp. As the Court of Appeal correctly noted, however, the trial court did not give such an instruction. According to the transcript, when instructing the jury on count 1, the murder of Jack Gibson, the trial court first explained the elements of murder. The court then defined first and second degree murder. Following these explications of the law, the trial court instructed the jury on the transferred intent doctrine "[a]s it relates to the charges of murder . . . ." The court then instructed the jury on the elements of attempted murder.

The record makes clear the trial court's transferred intent instruction was given in relation to the charge of murder in count 1. The jury could not have reasonably understood the instruction to have any application to the counts relating to attempted murder. Defendant Scott's claim is unsupported by the record and is therefore rejected.

Defendant Scott also contends the trial court erred in instructing the jury on the doctrine of transferred intent in connection with the counts charging assault with a firearm on Calvin Hughes, Nathan Kelley, Gary Tripp, and Eugenia Griffin. Defendant raises this argument for the first time in his opening brief.

California Rules of Court, rule 29(b)(1) provides that, as a matter of policy, this court generally will not consider "any issue that could have been but was not timely raised in the briefs filed in the Court of Appeal." In the Court of Appeal, defendant did not raise the issue whether a transferred intent instruction was properly given as it related to the assault charges. We therefore do not address his contention here. (Cf. *People* v. *Bransford* (1994) 8 Cal.4th 885, 893, fn. 10 [35 Cal.Rptr.2d 613, 884 P.2d 70]; *People* v. *Cookson* (1991) 54 Cal.3d 1091, 1100 [2 Cal.Rptr.2d 176, 820 P.2d 278].)

### III. DISPOSITION

The judgment of the Court of Appeal affirming the judgments of conviction is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.**—I concur in the judgment.

In my view, the time has come to reconsider one aspect of the law of murder, specifically, the antique common law rule variously referred to as "transferred malice" or, more usually if less accurately, "transferred intent."

Murder is the unlawful killing of a human being by another human being with malice aforethought. (Pen. Code, § 187, subd. (a); accord, e.g., 2 LaFave & Scott, Substantive Criminal Law (1986) § 7.1, p. 181 [speaking of Anglo-American law generally]; Perkins & Boyce, Criminal Law (3d ed. 1982) p. 57 [same].) Malice aforethought may be express—consisting of the unlawful intent to kill—or implied—comprising any other mental state that may tolerably be identified as recklessness. (See Pen. Code, § 188; accord, e.g., 2 LaFave & Scott, Substantive Criminal Law, *supra*, § 7.1(a), pp. 181-184 [speaking of Anglo-American law generally]; Perkins & Boyce, Criminal Law, *supra*, pp. 57-78 [same].)

To quote Lord Hale, the "transferred intent" rule is to the following effect: "[I]f *A.* by malice forethought strikes at *B.* and missing him strikes *C.* whereof he dies, tho he never bore any malice to *C.* yet it is murder, and the law transfers the malice to the party slain . . . ." (Hale, Historia Placitorum Coronae (1736) p. 466.)

The "transferred intent" rule, of course, does not literally "transfer" malice aforethought or anything else *from* an intended victim *to* an unintended victim. It is nothing more, and nothing less, than a "legal fiction, used to reach what is regarded with virtual unanimity as a just result" in Lord Hale's paradigm. (*People* v. *Czahara* (1988) 203 Cal.App.3d 1468, 1474 [250 Cal.Rptr. 836]; see, e.g., Husak, *Transferred Intent* (1996) 10 Notre Dame J.L. Ethics & Pub. Pol'y 65, 65-69, 83-89; 1 LaFave & Scott, Substantive Criminal Law, *supra*, § 3.12(d), p. 399; Perkins & Boyce, Criminal Law, *supra*, at p. 921; Prosser, *Transferred Intent* (1967) 45 Tex. L.Rev. 650, 650; Ritz, *Felony Murder, Transferred Intent, and the* Palsgraf *Doctrine in the Criminal Law* (1959) 16 Wash. & Lee L.Rev. 169, 169.)

I would not abrogate the "transferred intent" rule simply because it is a legal fiction. The law is filled with devices of this sort. It could hardly operate if they were all absent.

The "transferred intent" rule, however, is a peculiarly mischievous legal fiction. (Dressler, Understanding Criminal Law (2d ed. 1995) § 10.04, p.

109; Perkins & Boyce, Criminal Law, *supra*, at pp. 924-926; see Husak, *Transferred Intent*, *supra*, 10 Notre Dame J.L. Ethics & Pub. Pol'y at pp. 65-91.) In spite of the long labors of courts and commentators, to this very day "there is no agreement about [its] general rationale . . . . [It] is nothing more than the name attached to an unexplained mystery." (Husak, *Transferred Intent*, *supra*, 10 Notre Dame J.L. Ethics & Pub. Pol'y at p. 67; see 1 LaFave & Scott, Substantive Criminal Law, *supra*, § 3.12(d), p. 401; Perkins & Boyce, Criminal Law, *supra*, at p. 921; Ritz, *Felony Murder, Transferred Intent, and the* Palsgraf *Doctrine in the Criminal Law*, *supra*, 16 Wash. & Lee L.Rev. at pp. 169, 183.) Without such a rationale, its invocation outside the simple facts of Lord Hale's paradigm would almost necessarily be arbitrary and capricious. (See Husak, *Transferred Intent*, *supra*, 10 Notre Dame J.L. Ethics & Pub. Pol'y. at pp. 75-83.) It does not entail "careful thought"—rather, it "operates as a substitute" therefor. (*Id.* at p. 87; see Ritz, *Felony Murder, Transferred Intent, and the* Palsgraf *Doctrine in the Criminal Law*, *supra*, 16 Wash. & Lee L.Rev. at p. 183 [implying that the "fiction of transferred intent" is "ridiculous"].)

Moreover, the "transferred intent" rule is an altogether unnecessary legal fiction. (E.g., Dressler, Understanding Criminal Law, *supra*, at p. 109; 1 LaFave & Scott, Substantive Criminal Law, *supra*, § 3.12(d), pp. 399-400; Perkins & Boyce, Criminal Law, *supra*, at pp. 924-925.) It is based on the assumption that, in its absence, the perpetrator could escape liability for murder if he unlawfully killed not his intended victim but rather some unintended victim. That assumption, in turn, is based on yet another, namely, that malice aforethought exists in the perpetrator only in relation to an intended victim. (See, e.g., Husak, *Transferred Intent*, *supra*, 10 Notre Dame J.L. Ethics & Pub. Pol'y at pp. 71-75.) It does not. (See, e.g., Dressler, Understanding Criminal Law, *supra*, at p. 109; 1 LaFave & Scott, Substantive Criminal Law, *supra*, § 3.12(d), p. 400; Perkins & Boyce, Criminal Law, *supra*, at pp. 924-925; Prosser, *Transferred Intent*, *supra*, 45 Tex. L.Rev. at pp. 653, 661.)

It is plain that *implied* malice aforethought does not exist in the perpetrator only in relation to an intended victim. Recklessness need not be cognizant of the identity of a victim or even of his existence. Recall the "classic example" of the "person who fires a bullet through a window, not knowing or caring whether anyone is behind" the pane. (*People* v. *Roberts* (1992) 2 Cal.4th 271, 317 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

It is also plain that *express* malice aforethought does not exist in the perpetrator only in relation to an intended victim. True, an unlawful intent to kill almost always happens to be directed at an intended victim. The reports

demonstrate that such an intent is rarely possessed as to everyone in general or no one in particular. But there is no requirement of an unlawful intent to kill *an intended victim*. The law speaks in terms of an unlawful intent to kill *a* person, not *the* person *intended to be killed*. (See Pen. Code, § 188 [providing that malice aforethought is "express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature"]; accord, e.g., Dressler, Understanding Criminal Law, *supra*, at p. 109 [speaking of Anglo-American law generally: "The social harm of murder is the 'killing of a human being by another human being.' The requisite intent, therefore, is the intent to kill *a*, not a specific, human being." (Italics in original.)]; Perkins & Boyce, Criminal Law, *supra*, at pp. 924-925 [same]; Prosser, *Transferred Intent*, *supra*, 45 Tex. L.Rev. at p. 653 [same]; but see *People* v. *Roberts*, *supra*, 2 Cal.4th at p. 320 [appearing to assume otherwise in dictum].) Certainly, so far as liability for murder is concerned, one cannot reasonably distinguish between *A*, who unlawfully kills *B* unlawfully intending to kill *B*, and *X*, who unlawfully kills *Y* unlawfully intending to kill *Z*. Both *A* and *X* harbor the same blameworthy mental state, an unlawful intent to kill. Both *A* and *X* cause the same blameworthy result, an unlawful killing. That through some combination of luck and skill *A* proves to be "successful" in his attack on *B* and *X* proves to be "unsuccessful" in his attack on *Y* is of no consequence for purposes here.[1]

For the reasons stated above, I would abrogate the "transferred intent" rule.

---

[1]That malice aforethought does not exist only in relation to an intended victim does *not* mean that liability for murder extends to *all* unintended victims or even to *any* unintended victim. Proximate cause is required for each. (See, e.g., *People* v. *Roberts*, *supra*, 2 Cal.4th at pp. 315-320; cf. Model Pen. Code, § 2.03, subd. (2)(a) [providing that, "[w]hen purposely or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the purpose or the contemplation of the actor unless" "the actual result differs from that designed or contemplated, as the case may be, only in the respect that a different person . . . is injured or affected"]; *id.*, § 2.03, subd. (3)(a) [providing that, "[w]hen recklessly . . . causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware . . . unless" "the actual result differs from the probable result only in the respect that a different person . . . is injured or affected"].)