Filed 11/21/24  P. v. Rivera CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> JOSE RIVERA, <br><br>     Defendant and Appellant. | A166280 <br><br> (San Francisco County <br> Super. Ct. No. CRI-1778175) |

Defendant Jose Rivera filed a petition for resentencing under Penal Code section 1172.6.  The trial court issued an order to show cause and, following an evidentiary hearing, denied the petition.

On appeal from the order denying the petition, Rivera contends (1) the trial court applied the wrong burden of proof at the evidentiary hearing, (2) the court abused its discretion in admitting a confederate's hearsay statements, and (3) the prosecution failed to present sufficient evidence to support a finding that he is guilty of murder under current California law.

We conclude Rivera's first contention has merit, and therefore reverse and remand to allow the trial court to decide the petition under the appropriate standard of proof, which is whether the court finds, beyond a reasonable doubt, that Rivera is guilty of murder and attempted murder under current law.  We find no error in the admission of the confederate's

1

hearsay statement, and we reject Rivera's claim of the insufficiency of the evidence.

## FACTUAL AND PROCEDURAL BACKGROUND

*Underlying Charges, Plea, and Sentence*

By a complaint filed in April 1998, the San Francisco District Attorney charged Rivera and codefendant Marcelo Perez with one count of murder (Pen. Code,[1] § 187, subd. (a); count 1) and five counts of attempted murder (§§ 664, 187; counts 2 through 6). As to the murder and three of the attempted murder counts (counts 2, 3, 5), it was alleged that Rivera personally discharged (§ 12022.53, subd. (c)) and personally used (§ 12022.5, subd. (a)) a firearm in committing the offense. No firearm allegations were made against codefendant Perez. The complaint alleged that on or about April 15, 1998, Rivera and Perez killed Jesus Santos (count 1) and that on or about the previous day, April 14, Rivera and Perez attempted to murder James F. (count 2), John D. (count 3), Ariel C. (count 4), "Indio" or John Doe No. 1 (count 5), and "Goose" or John Doe No. 2 (count 6).[2]

In 2001, pursuant to a negotiated disposition, Rivera pleaded guilty to voluntary manslaughter (§ 192, subd. (a); amended count 1), admitting personal gun use in the commission of the offense (§ 12022.5, subd. (a)), three counts of attempted murder (counts 2, 3, and 4), and one count of assault with a firearm (§ 245, subd. (a)(2); amended count 5). Defense counsel stipulated to a factual basis for the plea, and the trial court found a factual

---

[1] Undesignated statutory references are to the Penal Code.

[2] We refer to the attempted murder victims by their first names in consideration of their personal privacy interests. (Cal. Rules of Court, rule 8.90(b)(4), (10).)

2

basis.  The remaining counts and allegations were dismissed, and Rivera was sentenced to 29 years in prison.

*Current Proceedings*

<u>Petition for Resentencing and Order to Show Cause</u>

In March 2022, Rivera filed a petition for resentencing under former section 1170.95,[3] seeking to vacate his voluntary manslaughter and attempted murder convictions on the ground he could not be convicted of these offenses based on recent changes to the murder statutes.  The prosecution conceded Rivera's petition made a prima facie case, and the trial court issued an order to show cause and scheduled an evidentiary hearing.

<u>The Prosecution's Evidence at the Hearing on Resentencing</u>

The prosecution argued Rivera was not entitled to relief because he was the actual killer in count 1 and the actual shooter in counts 2, 3, and 4.  For the evidentiary hearing, the prosecution presented the following evidence: (1) the reporter's transcript of the preliminary hearing held April 30, 1999, (2) the reporter's transcript of the change of plea hearing on October 15, 2001, and (3) a transcript of a police interview of Rivera conducted on April 19, 1998.  As we will describe, the convictions arose from three incidents that took place on April 14 and 15 in which Rivera, and his confederate Perez, allegedly drove to the vicinity of Woodward Street in San Francisco and were there involved with shootings against alleged members of the Norteño gang.  In one of the incidents, Jesus Santos, an apparent innocent bystander riding a bicycle (and whose identity was unknown to Rivera) was shot and killed.

---

[3] The statute was renumbered section 1172.6 without substantive change, effective June 30, 2022, before the trial court denied the petition in this case.  (Stats. 2022, ch. 58, § 10); *People v. Strong* (2022) 13 Cal.5th 698, 708, fn. 2 (*Strong*).)  We will refer to the current statute in this opinion.

3

*Preliminary Hearing Transcript*

The preliminary hearing transcript consisted of the testimony of some of the alleged victims and police officers (who, among other things, testified to statements made by Rivera and Perez). Neither Rivera nor Perez testified at their joint preliminary hearing.

James F., who lived on Woodward Street in San Francisco, testified that, shortly before 2:00 a.m. April 14, 1998, he "got drawn into" a fight at 16th and Mission Streets and "slapped" "[s]ome girl or something."[4] He then went home on foot. On Woodward Street, James saw his cousin, John D., and stopped to talk with him in front of his house. A gray Nissan with tinted windows turned onto Woodward from 14th Street and stopped in front of them. The front passenger of the Nissan climbed out of the window and "hung out the window and came over the roof." James got down on the ground and heard five or six shots. He could not identify the shooter. The next day, April 15, James heard some shots when he was inside his house. He looked outside to see if his friends were all right, and it did not appear that anyone had been shot.

John D. testified he and his cousin James were standing inside the gate of James's house when "a little gray car" came by, and shots were fired at them from the passenger side of the car.[5] John saw that the gun was a revolver. He was grazed in the left arm.

---

[4] At the time of the hearing, James F. was on probation for drug sales; he told a police officer he did not want to be a witness in this case.

[5] In cross-examination, John D. testified that James F. was with another person when he (James) arrived at his house. But John did not know who the person was.

Uriel C. testified that he was visiting James F. and John D. at their house on Woodward Street during the day on April 14, 1998 (that is, after the 2:00 a.m. shooting incident James and John described).[6] His friend Indio was there, too. He saw "a car roll up," and "they just started shooting." Five or six shots were fired. Uriel described the car as "primer" colored. Someone got out of the car; Uriel could not say if it was the passenger or the driver, but he knew "[t]hey were Mexicans." The shooting occurred in the afternoon. In cross-examination, Uriel testified he, John, and James were all in the same gang, and they are Norteños.

Rivera's attorney stipulated that on or about 1:30 p.m. on April 15, 1998, Jesus Santos was shot and killed on Woodward Street near James F.'s house.

San Francisco Police Officer Adriano Castro testified that on April 18, 1998, he stopped a gray Nissan on 16th Street. Codefendant Perez was driving the car, Rivera was in the front passenger seat, and another passenger, Gregory Sanchez, sat in the back seat on the passenger side. As Officer Castro approached the car, he saw Sanchez pushing a magazine of a handgun under the passenger seat. The three men were taken into custody. In a search of the Nissan, Castro found a semiautomatic weapon under the driver's seat and a loaded magazine under the front passenger's seat.

Officer Castro acted as Spanish language translator for police interviews of Rivera and Perez; at the preliminary hearing he testified about those interviews. In an interview with Perez on April 19, 1998, Perez told the police that he, Rivera, and a woman named Marlene were "involved in an altercation with some [N]orteños" at 16th and Mission around 1:30 in the

_____

[6] Uriel C. appears to be the person identified in the complaint as "Ariel" C., the alleged attempted murder victim in count 4.

5

morning the previous Tuesday (April 14, 1998).[7]  Marlene was pistol-whipped, and Perez and Rivera were hit.  They learned the Norteños lived on Woodward, and Rivera got a gun, but Perez "doesn't know how he got it."  They drove to "Woodward Alley" and saw three to five "Latin males" they thought were the Norteños who had assaulted them on Mission Street.  Perez said "that Mr. Rivera told him to slow down.  Mr. Rivera at this time stuck half his body out the window, and [Perez] heard some shots."  Perez said he was not sure whether the shots were coming from the men on the street or Rivera.  They drove away, and Perez told the police they returned to the location two more times.

Officer Castro testified that Perez reported that he and Rivera drove to the location again the same day at 1:30 p.m. (that is, about 12 hours after the initial altercation).  Rivera told Perez to wait for him, and Rivera got out of the car.  A few seconds later, Perez heard four or five shots, then Rivera returned to the car and told Perez to take off.  Perez said he did not see Rivera or anyone else with a gun.

Officer Castro testified that Perez told the police he and Rivera drove nearby the following day (April 15, 2018) around 1:30 p.m.  They parked a half a block away from Woodward Alley and walked to the corner of Woodward and 14th.  Perez stayed at the corner, and Rivera continued.  Perez told the police he "asked Mr. Rivera to come back several times," but Rivera continued walking.  Perez "saw a gentleman on a bicycle come by him on the same side of the street . . . .  The gentleman[8] continued on his bicycle

---

[7] Perez's statements to the police were introduced through Castro's testimony.  The quoted statements are from Castro's testimony describing what Perez told the police.

[8] The fact that a man riding a bicycle was shot is repeatedly mentioned in the witness statements, but the victim is not identified by name.  In

north, and the next thing [Perez] heard was several shots." Perez got scared and ran to his car; Rivera ran to the car, too, and Rivera got in the driver's seat, and they drove away. Perez said he did not see anything happen to anybody.

Officer Castro also testified about the police interview with Rivera. He testified that Rivera's "story was almost the same [as Perez's] but with some variations." Rivera "was very vague" and "[t]here was a lot of confusion of how many times they went up there" ("up there" apparently referring to Woodward). Rivera said that in the first incident, they drove to Woodward and "there were some shots exchanged between the [N]orteños and themselves as they were driving by the first time."[9] Rivera told the police, "the second time they drove by, . . . no shots [were] exchanged." On a third occasion, Rivera, Perez, and a third person called Goyo[10] drove down Woodward, and "the same [N]orteños that they had had the shootings with in the past began to shoot at them." Rivera said Goyo, who was sitting in the back seat, shot about five rounds at the Norteños and Rivera shot twice. He said the Norteños fired at them about seven times.

Castro testified that Rivera did not remember a bicyclist at first. But Castro testified, "Towards the end of the interview [Rivera] remembers

_____

context, it is apparent that the officers and Rivera and Perez understood that the person on the bicycle was the murder victim in count 1, that is, Jesus Santos.

[9] Again, the cited testimony in this and the following paragraph are from Officer Castro's preliminary hearing testimony in which he described what Rivera said; they are not verbatim quotes of Rivera's statements during the police interview.

[10] Officer Castro testified that "Goyo" was Gregory Sanchez, who was sitting in the back seat of the gray Nissan at the traffic stop on April 18, 1998.

seeing somebody on a bicycle and somebody on the bicycle being shot by [Rivera] during the exchange of fire."

Another police officer, James Miller, testified that he spoke with codefendant Perez at the police station on April 18, 1998. Perez asked why he was going to jail, and Miller told him a gun was found in his car. According to Miller, Perez responded that the gun belonged to his friend, " '[t]he passenger that was sitting next to me.' " Miller testified that Perez said, " 'He was supposed to tell you,' referring to Mr. Rivera, 'that the drugs and the gun [are] his.' "[11]

### Police Interview Transcript

A translated transcript of a police interview of Rivera was admitted in evidence at the evidentiary hearing on the petition for resentencing. In his interview with two police inspectors and Officer Castro (who, as we have noted, was translating), Rivera said he wanted to tell them what happened. Initially, he told the police he was on 16th and Mission with his cousin (Perez) and Goyo when two or three Norteños "pulled the gun on me and the girl" because he had a gold crucifix.[12] Rivera said, "they started to take away my . . . chain." The Norteños "hit [the girl] in the face" with the "tip of the barrel" and "they fired a . . . shot at me but it didn't go off."

Rivera referred to multiple incidents with the Norteños. He described an incident where "we had a weapon" and "we took it out on them," and "they then started shooting at us." Rivera said this occurred at 15th and Woodward, and "we started shooting at each other." He said the Norteños

---

[11] Perez, but not Rivera, was charged with possession for sale of heroin and cocaine.

[12] Here, the quotes are from the transcript of Rivera's interview with the police in which Officer Castro acted as the translator.

fired first, and then Goyo shot back. The Norteños "had big weapons" and "they fired about six or seven" shots. Goyo "fired about five" shots. Rivera admitted that he also shot at the Norteños, stating, "I had a weapon," "but I, I only fired two shots."

The police asked when the next shooting was. Rivera responded, "it was when we ran into each other there on Fifteenth" and Woodward. Castro confirmed, "The third time," and Rivera responded, "Yes." Rivera said the Norteños shot at them, but, when asked whether he and his companions also shot, he responded, "No, we didn't shoot."[13]

The police asked about the "last time on Woodward" "when you saw the guy on the bicycle." At first, Rivera said he "didn't see . . . any guy, we shot at each other, but from the car." Later, however, he was asked to demonstrate where people were on Woodward, and Rivera said, "The one with the bike was here," indicating on a diagram of the streets where Jesus Santos, the victim in count 1, was at the time he was shot and killed. He said it "was not intentional," and "I didn't *want* to hit anybody," although he agreed he was firing at the Norteños. (Underlining deleted.)

Trial Court Ruling on Petition for Resentencing

The evidentiary hearing under section 1172.6 took place over two days. The trial court heard argument and took the matter under submission on

_____

[13] The police asked Rivera, "And did you shoot the second time?" He said, "Yes." Asked who he shot at, Rivera responded, "No, well, I fired at the car" the Norteños were in. He said he "didn't hit anybody." However, earlier in the interview, Rivera said, "the first time we shot and then the second time we didn't anymore," and "the second time" was when "we met on Sixteenth street [and Valencia], the red car." The police did not appear to follow up on the red car reference.

9

August 8, 2022. At a hearing on August 29, 2022, the trial court announced its ruling in open court, denying the petition for resentencing.

Before announcing its ruling, the court framed its task this way: "So the issue for the Court is as to the murder charge, Count 1, is did Mr. Rivera accept a plea offer in l[i]eu of the trial, and *could* [he] have been convicted of murder, based on the information that allowed the People to proceed on a theory of felony murder, natural, and a probable consequence theory, or so-called other theory, in which malice is imputed based solely on participation in the crime. [(Italics added.)] [¶] And the Court answers no to all those questions. I don't see a felony murder theory here. I don't see a target crime, so I don't see a natural probable consequences theory, and I don't see an[y] other theory that would impute malice." "Then as to the three attempted murder convictions . . . . · The query here is, was the People's theory of attempted murder based on a natural and probable consequence doctrine? That seems to be the limitation for the Court's inquiry as to attempted injury, and here again, it appears that the People's theory that the defendant was the actual shooter are supported by facts and circumstantial evidence in the case."

The court summarized the evidence and later stated, "So based on the evidence that was provided as a basis for the plea to voluntary manslaughter, the Court does not find that any of the parts of 1172.6, which discuss when relief will be granted, fit this particular scenario. The Court instead finds that Mr. Rivera appears to be the actual killer in the case, and if not, certainly his actions were—he was directly participating in the shooting of the bicyclist and therefore does not qualify for relief."

10

## DISCUSSION

### A.  *The Applicable Burden of Proof and the Evidentiary Hearing*

Rivera contends the trial court erred by applying the wrong burden of proof at his section 1172.6 evidentiary hearing.  This contention has merit.

#### 1.  Resentencing Under Section 1172.6

"Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015; Senate Bill 1437) eliminated natural and probable consequences liability for murder as it applies to aiding and abetting, and limited the scope of the felony-murder rule.  (Pen. Code, §§ 188, subd. (a)(3), 189, subd. (e), as amended by Stats. 2018, ch. 1015, § 2, 3.)"  (*People v. Lewis* (2021) 11 Cal.5th 952, 957.)  Senate Bill 1437 also provided "a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief."  (*Ibid.*)

The procedure for those convicted under the former law to seek retroactive relief under the current law "begins with the filing of a petition containing a declaration that all requirements for eligibility are met."  (*Strong*, *supra*, 13 Cal.5th at pp. 708–709.)  The eligibility requirements are listed in section 1172.6, subdivision (a).[14]  If a petitioner "has made a prima

---

[14] The initial requirements for filing a petition and seeking relief under section 1172.6 are: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine.  [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder.  [¶] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (a).)  This section is preliminary to—and different from—the requirements of the

facie showing of entitlement to relief, 'the court shall issue an order to show cause' (§ 1172.6, subd. (c))," after which, the trial court must hold an evidentiary hearing. (*Strong, supra,* 13 Cal.5th at pp. 708–709.)

The evidentiary hearing is governed by section 1172.6(d)(3), which provides in relevant part: "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner *is guilty* of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . . A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (Italics added.)

The trial court's role at an evidentiary hearing under section 1172.6(d)(3) "is to act as an independent fact finder and determine, in the first instance, whether the petitioner committed murder [or attempted murder] under the law as amended by Senate Bill No. 1437." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123.)

2.    Analysis

In this case, the prosecution conceded Rivera made a prima facie case, and the trial court ordered an evidentiary hearing.

---

evidentiary hearing to determine whether a petitioner is entitled to relief (§ 1172.6, subd. (d)(3) (§ 1172.6(d)(3)), and may have been the source of the analytical mistake in the trial court.

After the evidentiary hearing and before announcing its ruling, the trial court stated that it was deciding the petition based on its determination of whether Rivera "could have been convicted of murder . . . on a theory of felony murder, natural, and a probable consequence theory, or so-called other theory, in which malice is imputed based solely on participation in the crime" and, similarly, whether "the People's theory of attempted murder [was] based on a natural and probable consequence doctrine." But these preliminary issues of prima facie eligibility for resentencing (see § 1172.6, subd. (a)) were matters to be considered in deciding whether to issue an order to show cause (§ 1172.6, subd. (c)). These considerations were not proper bases for denying relief *after* the trial court issued an order to show cause and set an evidentiary hearing. (See § 1172.6, subd. (d); *People v. Clements* (2022) 75 Cal.App.5th 276, 294 [once the court issues an order to show cause, "the statute shifts the burden to the People," and "[t]he question is whether the petitioner committed murder under a still-valid theory"].)

Instead, at the evidentiary hearing, the trial court's decision was governed by section 1176.2(d)(3), which required the court to decide the petition based on whether the prosecution met its burden of proving "beyond a reasonable doubt, that the petitioner *is guilty* of murder" (count 1) and "attempted murder" (counts 2, 3, and 4) under current law. (§ 1172.6(d)(3), italics added.) The trial court erred here because it failed to make these determinations.[15] It asked the wrong question, and, by applying the incorrect legal standard, committed error.

---

[15] Initially, the Attorney General argues Rivera forfeited his claim by failing to raise it with the trial court. But defense counsel did raise the issue of the proper trial court determinations under section 1172.6(d)(3). At the evidentiary hearing, the prosecutor argued that Rivera could not prevail because he did not meet the eligibility requirement of section 1172.6,

The Attorney General argues that the record in this case does not overcome the presumption that the trial court applied the correct beyond-a-reasonable-doubt burden of proof. We disagree. The trial court stated on the record the standard it was applying to decide the petition, and its statement was incorrect. This overcomes the presumption the trial court was aware of and followed the applicable law.

Next, the Attorney General argues that any error was harmless because the trial court's "factual summary of events indicates how it viewed the facts." But the trial court's statements about the evidence do not demonstrate that it necessarily would have found Rivera guilty of murder and three counts of attempted murder beyond a reasonable doubt had it acted as an independent fact finder deciding whether Rivera was guilty beyond a reasonable doubt as it was required to do under section 1172.6(d)(3). The court noted "it was somewhat unclear" what happened in the second alleged shooting incident and summarized, "Mr. Rivera says there were no shots fired the second time; there was other evidence that there were shots fired, it was far from clear." The court described statements Perez and Rivera made to the police but did not make any credibility determinations. And the court found only that Rivera "appears" to be the actual killer.

On this record, we conclude there is a " ' " 'reasonable chance, more than an abstract possibility' " ' " that a more favorable result would have been

subdivision (a)(3), that he "could not presently be convicted of murder or attempted murder because of changes to sections 188 and 189 which were effective January 1, 2019." Defense counsel responded that the "order to show cause hearing is governed by subdivision D3" of section 1172.6, and "the issue, at this hearing, is whether there's proof beyond a reasonable doubt presented to this Court that sits as an independent fact finder by current law; it's not about what a judge could have done or might have done."

reached had the trial court applied the correct standard of proof. (*People v. Hendrix* (2022) 13 Cal.5th 933, 944.) Under this circumstance, we will remand the matter to allow the trial court to determine whether the prosecution proved beyond a reasonable doubt that Rivera is guilty of murder and three counts of attempted murder. (See *People v. Arnold* (2023) 93 Cal.App.5th 376, 391 [where the trial court erred at the evidentiary hearing, "it is appropriate to remand the matter for a new hearing to determine whether the prosecution proved, beyond a reasonable doubt, that defendant is guilty under a permissible theory of murder"].) We express no opinion as to the outcome of the trial court's review of the evidence under the appropriate standard of proof.

B.    *Admission of Codefendant's Hearsay Statements*

As we have seen, codefendant Perez's statements to the police were introduced at the preliminary hearing through the testimony of Officer Castro and Officer Miller. In briefing and at the evidentiary hearing on the petition for resentencing, defense counsel argued Perez's statements were inadmissible hearsay for purposes of the petition. The trial court overruled the objection, finding Perez's "statements were so intertwined between incriminating himself and incriminating his co-defendant," that they were admissible under the hearsay exception for declarations against penal interest.[16]

---

[16] Under section 1172.6(d)(3), the admission of evidence at the evidentiary hearing is "governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing

Rivera contends the trial court erred in admitting Perez's hearsay statements at the evidentiary hearing on the petition for resentencing. We review the court's decision to admit evidence under a hearsay exception for abuse of discretion. (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)

While hearsay statements are generally inadmissible (Evid. Code, § 1200, subd. (b)), there are many exceptions to this rule, including an exception for declarations against penal interest. (*Grimes*, *supra*, Cal.5th at p. 710.)[17] The focus of a hearsay exception " 'is the basic trustworthiness of the declaration, and that question is entrusted to the trial court's discretion.' " (*People v. Wilson* (1993) 17 Cal.App.4th 271, 276.)

The hearsay exception for declarations against penal interest does not apply to statements that are not "specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441.) Courts bar "admission of those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others." (*Grimes*, *supra*, 1 Cal.5th at p. 715.) But whether a statement is disserving to the interests of the declarant depends on the context in which it was made. (*Ibid*.) In addition, our high court "permit[s] the admission of those portions of a confession that, though not independently disserving of the declarant's penal

---

as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule."

[17] Evidence Code section 1230 provides in relevant part, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

16

interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' " (*Ibid.*)

On appeal, Rivera does not dispute that Perez's statements were "at least in part, against his penal interest" because Perez admitted to driving Rivera to and from three separate shooting incidents, arguably making him an aider and abettor to any shooting Rivera committed.[18] But Rivera contends the portions of Perez's statements that implicated Rivera were not sufficiently reliable. (See *People v. Duarte* (2000) 24 Cal.4th 603, 614 [a declaration against penal interest "may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission"].)

We conclude the trial court acted within its discretion in determining that Perez's statements inculpating Rivera were intertwined with (or inextricably tied to) statements against his own penal interest. As Rivera concedes, Perez's account implicates himself as an aider and abettor in three separate shooting incidents. " 'Evidence Code section 1230 only permits an exception to the hearsay rule for statements that are specifically disserving of the declarant's penal interest. [Citation.] This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest. Such a determination necessarily depends upon a careful analysis of what was said and the totality of the circumstances.' " (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1217.) Considering Perez's statements and the circumstances under which they were made, we cannot say the trial court abused its discretion in determining the statements were admissible as declarations against penal interest.

---

[18] Nor does Rivera dispute that Perez was "unavailable" as required under Evidence Code section 1230.

C.  *Sufficiency of the Evidence*

Finally, Rivera contends the prosecution failed to offer sufficient evidence to prove Rivera was guilty of murder under a still-valid theory.[19]  He argues that his own statements to the police did not establish that he caused the victim's death or that he aided and abetted the killer or that he acted with malice.  If this claim had merit, then under section 1172.6, subdivision (d), Rivera would be entitled to have his voluntary manslaughter conviction vacated as a matter of law.  (See, e.g., *People v. Underwood* (2024) 99 Cal.App.5th 303, 321–322 [reversing the denial of section 1172.6 petition because no substantial evidence was presented that the petitioner was guilty of murder under current law and directing the trial court to vacate the petitioner's murder conviction].)  However, we conclude the record contains sufficient evidence for the trial court to find Rivera guilty of murder under current law on remand.

First, Rivera pleaded guilty to voluntary manslaughter of Jesus Santos and admitted he personally used a firearm in committing the offense.  A guilty plea " 'amounts to an admission of every element of the crime and is the equivalent of a conviction.' " (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 458.)  While this does not mean Rivera is necessarily guilty of voluntary manslaughter now, it does mean that Rivera has admitted that the killing of Santos was a voluntary manslaughter and that Rivera, at the very least, personally used a firearm in the commission of a target crime during which a coparticipant committed voluntary manslaughter of Santos.[20]

---

[19] Rivera does not challenge the sufficiency of the evidence as to the three attempted murder convictions.

[20] At the time he entered his plea, Rivera could have been convicted of voluntary manslaughter on the theory that (1) he aided and abetted a coparticipant in the commission of a target offense; (2) during the commission

Second, Rivera told the police that he and his confederates had multiple confrontations with persons he believed were Norteños and that, during one of the confrontations, he fired at the Norteños two times and his confederate shot at the Norteños five times. He also said a person on a bicycle was nearby during the shooting.

Taken together, this was sufficient evidence for a reasonable trier of fact to find Rivera is guilty of murder under current law. A reasonable trier of fact could find that Rivera was the actual killer and he acted with implied malice. (§§ 187, subd. (a) [murder is an unlawful killing "with malice aforethought"], 188, subd. (a)(2) ["Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart"]; *People v. Rivera* (2021) 62 Cal.App.5th 217, 231 [implied malice is " 'when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses' "].) Or a reasonable trier of fact could find that Rivera aided and abetted his confederate in the killing and that Rivera harbored an intent to kill. That he may have intended to kill only suspected Norteños and not the victim would not negate a finding of malice. (See *People v. Scott* (1996) 14 Cal.4th 544, 546 [under "California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and

of the target offense, a coparticipant committed voluntary manslaughter; and (3) under all the circumstances, a reasonable person would have known that commission of voluntary manslaughter was a natural and probable consequence of the commission of the target offense. (See, e.g., *People v. Smith* (2014) 60 Cal.4th 603, 612–613 [instructing jury the defendant could be found guilty of murder or voluntary manslaughter under the natural and probable consequences doctrine where the target offenses were disturbing the peace or assault or battery].)

19

hits a bystander instead is subject to the same criminal liability that would have been imposed had ' "the fatal blow reached the person for whom intended" ' "].)

By the foregoing, we do not mean to imply that Rivera *is* guilty of murder. Our only conclusion is that the prosecution presented enough evidence that the matter must be remanded for reconsideration under the appropriate standard of proof required by the statute (§ 1172.6(d)(3)).

## DISPOSITION

The order denying defendant's petition under section 1172.6 is reversed. The matter is remanded to the trial court to decide the petition under section 1172.6(d)(3), applying the appropriate standard of proof.

_____
Miller, J.

WE CONCUR:


_____
Stewart, P. J.


_____
Richman, J.


A166280, *People v. Rivera*