Filed 2/9/26  P. v. Rodriguez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDGAR RODRIGUEZ,<br><br>    Defendant and Appellant. | H052160<br>(Monterey County<br>Super. Ct. No. SS110890A) |

In 2011, believing that brothers in a rival gang slashed his tires, Edgar Rodriguez recruited two members of his gang to retaliate by slashing the tires of one of the brothers and then shooting him.  As planned, the fellow gang members, Pedro Vargas and William Turcios, lured one of the brothers out by slashing his tires and fired at him.  However, one of Vargas' shots hit Turcios and fatally wounded him.  Rodriguez was charged with murdering Turcios as well as attempting to murder the brother.  Rodriguez eventually pleaded no contest to these charges and was sentenced to 28 years, 4 months in prison.

In 2023, in light of changes to homicide law made by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Sen. Bill 1437), Rodriguez petitioned for resentencing under Penal Code section 1172.6.  After an evidentiary hearing, the trial court denied the petition based on a finding that Rodriguez aided and abetted both the manslaughter and the attempted murder with intent to kill, which remains a valid ground after Sen. Bill 1437 for murder liability.  In so doing, the court relied on the doctrine of transferred intent,

which treats an individual who shoots at one person with an intent to kill but unintentionally kills another as culpable as if he had achieved his objective. (See, e.g., *People v. Scott* (1996) 14 Cal.4th 544, 549 (*Scott*).)

On appeal Rodriguez argues that Sen. Bill 1437 abrogated the transferred intent doctrine in homicide cases. Well-reasoned decisions from both this District and the Fifth District have rejected this argument, and Rodriguez does not offer a persuasive reason to depart from them. Rodriguez's remaining objections to the denial of resentencing are also unpersuasive. However, we agree that Rodriguez's custody credits were incorrectly calculated. Accordingly, we affirm the order denying resentencing, but direct the trial court to prepare a corrected abstract of judgment.

## I. BACKGROUND

### A. The Underlying Offenses

Rodriguez was a member of the Norteño gang. He also had a long-simmering feud with the Gonzalez brothers, who were members of the rival Sureño gang. In late March 2011, Rodriguez woke up to find the tires on his car slashed, and he saw the Gonzalez brothers nearby. As the two brothers were known to do such things, Rodriguez believed that they had slashed his tires, became angry, and decided to retaliate.

Rodriguez texted Turcios and Vargas, who were fellow members of the Norteño gang, about the slashing of his tires and recruited them to retaliate against the Gonzalez brothers. Rodriguez planned for Turcios and Vargas to lure one brother out of his apartment (by slashing his tires) and then shoot him. To implement this plan, Rodriguez purchased a .357 magnum for Turcios, and Vargas secured a .45-caliber firearm for himself. Rodriguez also arranged with a gang associate to hide out in another town "after we smoke" someone.

Two hours before the shooting, Rodriguez texted a friend that "u should stay inside" because "[s]omething gon to happen tonight." Later, shortly before the shooting, Rodriguez picked up Turcios and then Vargas, drove them to the apartment of the

2

Gonzalez brother, parked out of view, and waited so that he could act as the getaway driver. As planned, the Gonzalez brother was lured outside where he saw two men, one of whom fired on him.

Although the brother was not hit, Turcios was. A bullet fired by Vargas struck Turcios in the back, penetrated his lung, and exited the left side of his chest, causing massive, rapid blood loss. After Turcios and Vargas returned to Rodriguez's car, Rodriguez drove them to the hospital, where Turcios died that night.

## B. The Convictions

In May 2011, a little over a month after the shooting, a complaint charged Rodriguez and Vargas with the murder of Turcios under Penal Code section 187, subdivision (a) and the attempted murder of the Gonzalez brother under Penal Code section 187, subdivision (a) and section 664. (Subsequent undesignated statutory citations are to the Penal Code.) The complaint also charged both Rodriguez and Vargas with assault with a firearm under section 245, subdivision (b), shooting at an occupied motor vehicle under section 246, and engaging in a pattern of criminal gang activity under section 182.5. In addition, the complaint alleged that these offenses were committed for the benefit of a criminal street gang under section 186.22, subdivision (b)(1) and that Rodriguez (but not Vargas) used a firearm under section 12022.5, subdivision (a). In August 2011, an information was filed, which changed the fourth count to shooting at an occupied dwelling under section 246.

In April 2013, Rodriguez entered into a plea agreement with a total stipulated sentence of 28 years, 4 months. Pursuant to this agreement, the district attorney orally amended the information to add to the murder count 1 the lesser included offense of voluntary manslaughter under section 192, subdivision (a). Rodriguez then pleaded no contest to voluntary manslaughter, attempted murder, and shooting at an inhabited dwelling, and he admitted to the gang enhancement. Later, the remaining counts and enhancements were dismissed.

3

In June 2013, Rodriguez was sentenced per his agreement to 28 years, 4 months in prison. For voluntary manslaughter, he received 11 years with another 10 years for the related gang enhancement. For attempted murder, he received a consecutive term of 2 years, 4 months and 3 years, 4 months on the gang enhancement related to that conviction. Finally, for shooting at an inhabited dwelling, he received a consecutive term of 1 year, 4 months.

The trial court also determined that Rodriguez was entitled to 768 days of actual custody credits and 115 good time or work credits for a total of 883 credits, which was recorded in the abstract of judgment.

## C. The Petition for Resentencing

In August 2023, Rodriguez filed a form petition seeking resentencing under section 1172.6. Rodriguez contended that he was entitled to resentencing because he was charged with both murder and attempted murder under either a felony murder or a natural and probable consequences theory under which he could no longer be convicted.

The trial court found that Rodriguez had made a prima facie showing for relief, and held an evidentiary hearing. Relying primarily on transcripts from the preliminary hearing as well as Rodriguez's admissions in the probation report, the prosecutor presented only brief live testimony from one witness. However, Rodriguez presented live testimony from nine witness over the course of four days, including himself and his codefendant Vargas.

After receiving post-hearing briefing, the trial court denied resentencing. The court found that Rodriguez had a long-simmering dispute with the Gonzalez brothers, which escalated when Rodriguez blamed them for slashing his tires, and that Rodriguez recruited Vargas and Turcios to lure out one of the brothers and shoot him. Noting that Rodriguez admitted to a probation officer that "he knew they [Vargas and Turcios] planned to kill at least one Gonzalez brother," the trial court found that "Mr. Rodriguez's actions and his words reveal that he was the mastermind of a plan to shoot and kill the

4

Gonzalez brothers for revenge and retaliation" and that Rodriguez had "an intent to kill when he added and abetted the shooters, Mr. Vargas and Mr. Turcios."

Based on these findings, the trial court concluded that Rodriguez was guilty of both manslaughter and attempted murder. First, the court found that Rodriguez "aided and abetted with the intent to kill . . . that is necessary for conviction of the attempted murder" of the Gonzalez brother. Second, "[w]ith respect to the manslaughter" of Turcios, the court found that Rodriguez "aided and abetted with the intent to kill the Gonzalez brothers" and, "alternatively, that he aided and abetted with consciously disregard for human life." In concluding that Rodriguez was guilty of manslaughter, the trial court recognized that Turcios was not the intended victim and was killed by mistake. However, the court observed that "the transferred intent doctrine permits homicide culpability when someone intended to kill one person, but by mistake or accident killed someone else instead."

Rodriguez filed a notice of appeal on the day that resentencing was denied.

## II. DISCUSSION

### A. Survival of the Transferred Intent Doctrine

On appeal Rodriguez challenges the trial court's conclusion that he is guilty of the manslaughter of Turcios under current law. In particular, he argues that Sen. Bill 1437 abrogated the transferred intent doctrine on which the trial court relied in finding him guilty of manslaughter. As explained below, we disagree.

#### 1. Relevant Legal Principles

Before addressing whether Sen. Bill 1437 abrogated the transferred intent doctrine, we briefly review that statute, the natural and probable consequences doctrine amended by the statute, and the transferred intent doctrine. We begin with the transferred intent doctrine.

5

### a. The Transferred Intent Doctrine

In homicide cases such as this one, the doctrine of transferred intent addresses whether perpetrators are criminally responsible for unintended deaths. "Under the doctrine, if a defendant intended to kill A but inadvertently killed B, the intent to kill A is deemed to transfer to the killing of B, so that the defendant is guilty of B's murder." (*People v. Mumin* (2023) 15 Cal.5th 176, 190 (*Mumin*).) As the Supreme Court explained long ago, the concept of transferred intent "is a 'bare-faced' legal fiction." (*Scott, supra*, 14 Cal.4th at p. 550.) "[U]nder the transferred intent doctrine, the defendant's intent is not actually transferred from the intended victim to the unintended victim." (*People v. Concha* (2009) 47 Cal.4th 653, 664 (*Concha*).) Instead, the doctrine " 'connotes a *policy*—that a defendant who shoots at an intended victim with intent to kill but misses and hits a bystander instead should be subject to the same criminal liability that would have been imposed had he hit his intended mark.' " (*Id.* at p. 664.) In other words, under the transferred intent doctrine, "the defendant is deemed as culpable as if he had accomplished what he set out to do." (*Scott, supra*, 14 Cal.4th at p. 546.)

### b. The Natural and Probable Consequences Doctrine

The natural and probable consequences doctrine focuses on accomplices rather than perpetrators. It makes accomplices criminally liable for the unintended but reasonably foreseeable consequences of conduct that they assist. Specifically, "[u]nder the natural and probable consequences doctrine, an accomplice is guilty not only of the offense that he or she directly aided and abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime that the accomplice aided and abetted (i.e., the nontarget offense)." (*People v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*), superseded by statute on other grounds as stated in *People v. Oyler* (2025) 17 Cal.5th 756, 836.)

The natural and probable consequences doctrine "serves the purpose of 'deterring aiders and abettors from aiding or encouraging the commission of offenses that would

naturally, probably, and foreseeably result in an unlawful killing.' " (*Gentile*, *supra*, 10 Cal.5th at p. 845.) However, when the target offense is a crime such as assault or disturbing the peace, and therefore the accomplice did not intend to assist a homicide, the connection between the accomplice's culpability and the mental state required to convict for some types of homicide becomes attenuated. (*People v. Chiu* (2014) 59 Cal.4th 155, 166 (*Chiu*), superseded by statute on other grounds as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.) Accordingly, in 2014, the Supreme Court held that, even where the direct perpetrator of a murder is guilty of first degree premeditated murder, an accomplice who sought only to assist an assault may not convicted of first degree murder: "[T]he legitimate public policy considerations of deterrence and culpability," the Court reasoned, "would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Ibid*.)

In addition, although the Supreme Court concluded that an aider and abettor may be found guilty of second degree murder based on the natural and probable consequence doctrine (*Chiu*, *supra*, 59 Cal.4th at p. 165), the Legislature determined that even this criminal liability was unwarranted, and in 2017 it adopted a resolution declaring that further changes to the natural and probable consequences doctrine were needed to ensure that individuals were being sentenced in accordance with their involvement and culpability. (Sen. Conc. Res. No. 84, Stats. 2017 (2017-2018 Reg. Sess.) res. ch. 175; see *Gentile*, *supra*, 10 Cal.5th at pp. 845-846.)

c. <u>Sen. Bill 1437</u>

In 2018, the Legislature implemented its resolution the year before by enacting Sen. Bill 1437. (*Gentile*, *supra*, 10 Cal.4th at p. 846.) In that statute, the Legislature declared that "[i]t is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability" (Stats. 2018, ch. 1015, § 1, subd. (d)), and therefore it was necessary to amend the natural and probable consequences, as well as the felony murder, doctrines "to ensure that

7

murder liability is not imposed on a person who is not an actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life" (Stats. 2018, ch. 1015, § 1, subd. (f)).

To amend the felony murder rule, Sen. Bill 1437 added subdivision (e) to section 189. (See *Gentile*, *supra*, 10 Cal.5th at p. 842.) Under that subdivision, a person participating in a felony qualifying for felony murder is liable for murder only if the People prove that (1) the person was "the actual killer," (2) he aided and abetted the actual killer "with the intent to kill," or (3) he was a "major participant in the underlying felony" and "acted with reckless indifference to human life." (§ 189, subd. (e).)

To amend the natural and probable consequences doctrine, Sen. Bill 1437 added subdivision (a)(3) to section 188. (See *Gentile*, *supra*, 10 Cal.5th at p. 842.) Under this subdivision, to be convicted of any murder besides felony murder, "a principal in a crime shall act with malice aforethought." (§ 188, subd. (a)(3); see also § 31 [defining principal to include both persons committing a crime and those aiding and abetting the crime].) Even more pertinent to this case, the new subdivision also states that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

In addition to amending homicide law, Sen. Bill 1437 "created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended." (*People v. Strong* (2022) 13 Cal.5th 698, 708.) It enacted what is now section 1172.6, which creates a procedure for resentencing "those convicted of felony murder or murder under the natural and probable consequences doctrine." (*Gentile*, *supra*, 10 Cal.4th at p. 843 [discussing former section 1170.95]; see also Stats. 2022, ch. 58, § 10 [renumbering section 1170.95 as section 1172.6].) Under section 1172.6, a person may petition for resentencing if (1) he was charged with murder under a theory of a felony murder, under the natural and probable consequences doctrine, or other theory "under which malice is imputed to a person based solely on that person's

8

participation in a crime," (2) he was convicted of murder, attempted murder, or manslaughter, and (3) he "could not presently by convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019"—that is, Sen. Bill 1437.  (§ 1172.6, subd. (a)(3).)

If a person files a facially valid petition for resentencing and makes a prima facie showing of entitlement to relief, an evidentiary hearing is held.  (§ 1172.6, subd. (c).)  In such a hearing, the prosecution bears the burden of proving beyond a reasonable doubt that "the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)  If this burden is not satisfied, the prior conviction at issue is vacated and the petitioner resentenced.  (*Ibid*.)

### 2.  *Prior Decisions Concerning the Transferred Intent Doctrine*

After Sen. Bill 1437, courts have continued to recognize the validity of the transferred intent doctrine in homicide cases.  (See, e.g., *Mumin*, *supra*, 15 Cal.5th at p. 190.)  In addition, as Rodriguez acknowledges, two decisions have specifically considered whether the doctrine survived Sen. Bill 1437's amendments to homicide law. Both concluded that it does.

In February 2024, the Fifth District Court of Appeal considered the continuing validity of the transferred intent doctrine in *People v. Lopez* (2024) 99 Cal.App.5th 1242 (*Lopez*).  The appellant in that case helped a "home boy" to ambush and shoot a rival who was parked in a van.  (*Id*. at p. 1246.)  Although the rival was only injured, a second person in the van was unintentionally shot in the lung and killed.  (*Id*. at p. 1246.)  In 1996, the appellant was convicted of aiding and abetting the murder of the unintended victim.  (*Id*. at pp. 1245-1246).  In 2021, the appellant petitioned for resentencing, but the trial court denied the petition, finding that he was guilty of murder because he aided and abetted the unintended victim's murder with an intent to kill the target of the shooting.

9

(*Id.* at p. 1247.) On appeal, the appellant argued that the trial court implicitly relied on the transferred intent doctrine and that Sen. Bill. 1437 abrogated the doctrine. (*Id.* at p. 1267.) The Fifth District disagreed and upheld the denial of resentencing. (*Id.* at pp. 1249-1251.)

The Fifth District concluded that the transferred intent doctrine survived Sen. Bill 1473. Indeed, the court observed, "[n]othing in the language of this bill demonstrates or even reasonably suggests that, when eliminating the natural and probable consequences doctrine, the Legislature also intended to abolish the doctrine of transferred intent." (*Lopez*, *supra*, 99 Cal.App.4th at p. 1249.) In addition, the court continued, "we will not presume the Legislature intended to overthrow a long-established principle of law without making its intention clear" (*id.* at pp. 1249-1250).

The Fifth District also noted significant distinctions between the natural and probable consequences doctrine, which Sen. Bill 1437 amended, and the transferred intent doctrine. First, while the natural and probable consequences doctrine permits accomplices to be found guilty of murder without malice aforethought, the transferred intent doctrine "requires an intent to kill." (*Lopez*, *supra*, 99 Cal.App.5th at p. 1250.) Second, while under SB 1473's amendment to section 188 malice may not be imputed to a person "based solely on his or her participation in a crime" (§ 188, subd. (a)(3)), the transferred intent doctrine attributes the intent to kill the intended victim to the actual victim "based on policy reasons"—namely, the determination that " ' "a defendant who shoots at an intended victim with intent to kill but misses and hits a bystander instead should be subject to the same criminal liability that would have been imposed had he hit his intended mark." ' " (*Lopez*, at p. 1251, quoting *Concha*, *supra*, 47 Cal.4th at p. 664.)

In July 2024, in *People v. Nguyen* (2024) 103 Cal.App.5th 668 (*Nguyen*), this District agreed that the transferred intent doctrine survived Sen. Bill 1473. *Nguyen* arose out of a 1995 shooting of three gang members by members of a rival gang. (*Id.* at p. 674.) Although not one of the shooters, the appellant in *Nguyen* was convicted of first-

10

degree murder because he both conspired with the shooters and aided and abetted them. (*Id*. at pp. 674-675.)  In 2022, the appellant petitioned for resentencing under what is now section 1172.6, but the trial court denied the petition.  (*Id*. at pp. 675-676.)  On appeal, the appellant argued that at least one victim may have been unintended and that he could not be convicted of murder based on a death that he did not intend.  (*Id*. at pp. 678-680.)  In addressing this argument, this district considered whether Sen. Bill 1437 precluded application of the transferred intent doctrine.  (*Id*. at pp. 680-681.)

*Nguyen* agreed with *Lopez* that Sen. Bill 1437 does not abrogate the transferred intent doctrine.  (*Nguyen*, *supra*, 103 Cal.App.4th at pp. 682-685.)  In so doing, *Nguyen* noted *Lopez*'s conclusion that nothing in Sen. Bill 1437 suggests that the Legislature intended to abrogate the transferred intent doctrine and that it should not be presumed that the Legislature intended to reject such a long-recognized doctrine absent a clear statement.  (*Id*. at p. 683.)  In addition, *Nguyen* agreed that the doctrine does not "impute[]" malice in the fashion prohibited by Sen. Bill 1437's amendment.  (*Id.* at pp. 683-684.)

*Nguyen* also made three additional points.  First, the opinion noted that the transferred intent doctrine is consistent with the definition of malice under section 188 as amended by Sen. Bill 1437.  Under that section, "[e]xpress malice does not mean an intent to kill a *specific person* . . . ."  (*Nguyen*, *supra*, 103 Cal.App.4th at p. 679.)  Instead, section 188 states that malice is express "when there is manifested a deliberate intention to take away the life of *a* fellow creature."  (§ 188, subd. (a)(3), italics added.)  As a consequence, express malice "does not require a finding that the defendant specifically intended to kill the deceased victim(s)," and " '[a] defendant can be held liable for the unlawful killings of both the intended victims and any unintended victims,' " as the transferred intent doctrine provides.  (*Nguyen*, at p. 679, quoting *Concha*, *supra*, 47 Cal.4th at p. 660.)

11

Second, the transferred intent doctrine does not violate section 188's prohibition against imputing malice to a person "based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Under the doctrine, participating in or even committing a crime is not enough. A defendant may be held guilty of murder under the transferred intent doctrine only if the defendant "personally harbored an intent to kill unlawfully." (*Nguyen*, *supra*, 103 Cal.App.5th at p. 685.)

Third, the transferred intent doctrine is consistent with the stated purposes of Sen. Bill 1437. (*Nguyen*, *supra,* 103 Cal.App.5th at p. 685.) A central purpose of Sen. Bill 1437 was to ensure that homicide law " 'fairly addresses the culpability of the individual' " and punishes a person " 'for his or her actions according to his or her own level of individual culpability.' " (*Ibid*, citing Stats. 2018, ch. 1015, § 1, subds. (d) & (e).) The transferred intent doctrine does that: By requiring that a defendant "personally harbored an intent to kill unlawfully," the doctrine "ensures liability commensurate with his culpability." (*Ibid*.)

Thus, both *Lopez* and *Nguyen* offered compelling reasons for concluding that Sen. Bill 1437 did not abrogate the transferred intent doctrine.

### 3. *Rodriguez's Challenges to the Transferred Intent Doctrine*

Although Rodriguez asserts that *Lopez* and *Nguyen* are "distinguishable from the case at bar," he fails to explain how either case may be distinguished from this case. In addition, he makes no attempt to challenge the reasoning in either decision. Instead, Rodriguez offers a series of cursory arguments, several of which *Lopez* and *Nguyen* refuted. These arguments are unpersuasive.

#### a. Imputed Malice

Rodriguez asserts that "the transferred intent doctrine is an imputed malice theory that is abrogated by Senate Bill No. 1437." However, Rodriguez fails to support this assertion with any explanation how the transferred intent doctrine imputes malice. For this reason alone, Rodriguez's imputed malice argument fails. (See *People v. Williams*

12

(1997) 16 Cal.4th 153, 206 (*Williams*) ["Points 'perfunctorily asserted without argument in support' are not properly raised."]; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 (*Benach*) ["conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of this case, is inadequate"].)

In addition, contrary to Rodriguez's assertion, the transferred intent doctrine is not an imputed malice theory. Indeed, the doctrine does not clearly attribute or transfer anything. Although the Supreme Court once stated in passing that under the transferred intent doctrine the intent to kill is "imputed" from the intended victim to the unintentionally killed bystander (*Concha*, *supra*, 47 Cal.4th at p. 664), the Court immediately added that under the doctrine "the defendant's intent is not actually transferred from the intended victim to the unintended victim." (*Ibid*.) Indeed, as previously noted, the Supreme Court has described the concept of transferred intent as "a 'bare-faced' legal fiction." (*Scott*, *supra*, 14 Cal.4th at p. 550.) As the Fifth District noted (*Lopez*, *supra*, 99 Cal.App.4th at p. 1250), the transferred intent doctrine reflects a policy decision: namely, that an individual who attempts to kill one person but ends up killing another is "as culpable as if he had accomplished what he set out to do." (*Scott*, at p. 546.)

Even more important, the transferred intent doctrine does not impute malice in the fashion prohibited by section 188 as amended by Sen. Bill 1473. As noted above, Sen. Bill 1473 amended section 188 to provide that "[m]alice may not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Even if the transferred intent doctrine is understood to transfer a defendant's intent to kill from intended victim to unintended ones, it does not impute malice in the fashion contemplated by Sen. Bill 1473.

First, in Sen. Bill 1437, the Legislature declared that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea," and it was necessary to amend the law "to ensure that murder liability is not imposed on a

13

person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subds. (f) & (g).)  Thus, Sen. Bill 1437's concern was that the mental state justifying murder liability be the defendant's own, not another person's attributed or " 'imputed' " to the defendant.  The transferred intent doctrine is consistent with that concern because it "requires an intent to kill" by the defendant.  (*Lopez*, *supra*, 99 Cal.App.4th at p. 1250; see also *Nguyen*, *supra*, 103 Cal.App.5th at p. 685 ["the jury could not have convicted Nguyen of first degree murder without finding he personally harbored an intent to kill"].)  Indeed, as *Nguyen* observed, the "doctrine is typically applied in the context of a single defendant who is the actual killer."  (*Nguyen*, at p. 680; see *People v. Shabazz* (2006) 38 Cal.4th 55, 60, 62-66; *People v. Sutic* (1953) 41 Cal.2d 483, 491-492; but see *People v. Whitson* (2022) 79 Cal.App.5th 22, 33, fn. 9 [applying the transferred intent doctrine to conspirators]; *People v. Vasquez* (2016) 246 Cal.App.4th 1019, 1025-1026 [applying doctrine to aider and abettor].)  Consequently, in most cases in which the transferred intent doctrine is applied, there is no one else's mental state to attribute or impute to a defendant.

Second, under the transferred intent doctrine a defendant is not deemed to have acted with malice "based solely on that person's participation in a crime."  (§ 1172.6, subd. (a)(1).)  In the first place, for the doctrine to apply, a defendant must do more than participate in a crime; as just noted, the defendant must have "personally harbored an intent to kill unlawfully" the intended victim or target.  (*Nguyen*, *supra*, 103 Cal.App.5th at p. 685; *Lopez*, *supra*, 99 Cal.App.4th at p. 1250.)  In addition, under the doctrine a defendant is held guilty of murder based not on participation in a crime, but rather "on policy reasons"—that a defendant who tries to kill one person but unintentionally kills a bystander is as culpable as if he had achieved his objective.  (*Lopez*, at p. 1251.)

14

In short, the transferred intent doctrine is consistent with the prohibition in section 188, as amended by Sen. Bill 1437, against imputing malice based solely on participation in a crime.

b. The Natural and Probable Consequences Doctrine

Rodriguez also asserts that Sen. Bill 1437 abrogated the transferred intent doctrine because the statute abrogated the natural and probable consequence doctrine and the transferred intent doctrine incorporates the former doctrine. In fact, "to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3)" (*Gentile*, *supra*, 10 Cal.5th at p. 842), which, as just shown, is compatible with the transferred intent doctrine.

In addition, the transferred intent doctrine does not incorporate or fall within the natural and probable consequences doctrine. In fact, the two doctrines are quite different. The natural and probable consequences doctrine focuses on accomplices and makes them liable for "nontarget offenses," that is, criminal conduct the accomplices did not intend to assist. (*Gentile*, *supra*, 10 Cal.5th at p. 843 ["[U]nder the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)."].) Moreover, because a nontarget offense is the natural and probable consequence of a target offense if the nontarget offense was reasonably foreseeable, under the natural and probable consequences doctrine " 'liability " 'is measured by whether a reasonable person would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " ' " (*Id*. at pp. 843-844.)

By contrast, the transferred intent doctrine can be—and, in contrast to this case, typically is—applied to the perpetrator, that is, the actual killer. (*Nguyen*, *supra*, 103 Cal.App.5th at p. 680.) In addition, rather than making accomplices responsible for

15

criminal conduct that they did not intend to assist, the transferred intent doctrine makes perpetrators responsible for conduct that they intended but that befell an unintended victim—such as Vargas mistakenly shooting and killing Turcios while trying to kill a Gonzalez brother. (See *Concha*, *supra*, 47 Cal.4th at p. 664.) Finally, liability under the transferred intent doctrine is based not on foreseeability, but on the determination that a person who tries to kill one person but ends upon killing another is "as culpable as if he had accomplished what he set out to do." (*Scott*, *supra*, 14 Cal.4th at p. 546.)

In asserting that the transferred intent doctrine incorporates the natural and probable consequences doctrine, Rodriguez does not analyze either doctrine. Instead, he relies on the Supreme Court's decision in *People v. Roberts* (1992) 2 Cal.4th 271 (*Roberts*) and *People v. Gonzalez* (2012) 54 Cal.4th 643 (*Gonzalez*). However, *Roberts* did not focus on either the transferred intent doctrine or the natural and probable consequences doctrine. Instead, *Roberts* considered whether a prisoner could be convicted of murdering a correctional officer who was killed by another prisoner in a state of shock or delirium caused when the first prisoner stabbed him. (*Roberts*, at pp. 295-296, 315.) In discussing whether there was sufficient evidence to establish proximate cause, *Roberts* mentioned the transferred intent doctrine as a situation in which "the consequences of an evil act are so natural or probable that liability is established as a matter of policy." (*Id*. at p. 316.) However, *Roberts* did not suggest that the transferred intent doctrine is based solely or even primarily on the natural and probable nature of any consequences, and therefore *Roberts* does not support Rodriguez's assertion that the transferred intent doctrine is just an application of the natural and probable consequences doctrine.

*Gonzalez*, *supra*, 54 Cal.4th 643 is similarly inapposite. Like the defendant in *Roberts*, the defendant in *Gonzalez* the defendant was not convicted under either the transferred intent doctrine or the natural and probable consequences doctrine. Instead, the defendant in *Gonzalez* was prosecuted under the provocative act doctrine. (*Id*. at

16

p. 654.)  The provocative act doctrine "holds the perpetrator of a violent crime . . . liable for the killing of an accomplice by a third party, usually the intended victim or a police officer."  (*Ibid.*)  While *Gonzalez* observed that the provocative act doctrine is a variation of transferred intent law (*ibid.*), contrary to Rodriguez's assertion, it did not suggest that "the transferred intent doctrine is inextricably intertwined with the natural and probable consequences doctrine."  To the contrary, *Gonzalez* treated the two doctrines as distinct without in any way suggesting that they are intertwined.  (*Id.* at p. 653.)  Moreover, contrary to Rodriguez's assertion, the transferred intent doctrine does not impose "vicarious murder liability."  Indeed, as previously noted, the doctrine is typically applied in the context of a single defendant.  (*Nguyen*, *supra*, 103 Cal.App.5th at p. 680.)

c. <u>Participation in a Crime</u>

Rodriguez asserts that, because "section 1172.6 now affords relief to persons convicted of murder on a theory solely based on their participation in the underlying crime," the section also must afford relief to defendants convicted under the transferred intent doctrine.  That is wrong.  As shown above, the transferred intent doctrine does not impute liability solely based on participation in a crime.

d. <u>The Purpose and Intent of Sen. Bill 1437</u>

Rodriguez asserts that the transferred intent doctrine is "incompatible with the purpose and intent of SB 1437."  The only support offered for this assertion is an unexplained citation to a Court of Appeal opinion, *People v. Larios* (2019) 42 Cal.App.5th 956, that has been vacated by the Supreme Court.  (*People v. Larios*, transferred with instructions to vacate and reconsider, Feb. 16, 2022, S259983.)  Such a conclusory, unsupported argument is inadequate.  (*Williams*, *supra*, 16 Cal.4th at p. 206; *Benach*, *supra*, 149 Cal.App.4th at p. 852.)  In addition, as *Nguyen* demonstrated, the transferred intent doctrine is consistent with SB 1437's stated purpose of ensuring that homicide law " 'fairly addresses the culpability of the individual' " and that culpability is premised on a person's " 'own actions and subjective mens rea.' "  (*Nguyen*, *supra*, 103 Cal.App.5th at p. 685,

quoting Stats. 2018, ch. 1015, § 1, subds. (e), (g).) Moreover, Rodriguez offers no meaningful challenge to this demonstration.

### e. The Provocative Act Doctrine

Finally, Rodriguez invokes the provocative act doctrine. Noting that the doctrine has been described as "[a] variation on the law of transferred intent" (*Gonzalez*, *supra*, 54 Cal.4th at p. 654), Rodriguez argues that, if convictions under the provocative act doctrine are subject to resentencing under section 1172.6, convictions under the transferred intent doctrine must be as well. In fact, however, convictions under the provocative act doctrine generally are not subject to resentencing under section 1172.6.

Under the provocative act doctrine, "when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim kills in reasonable response to that act, the perpetrator is guilty of murder." (*Gonzalez*, *supra*, 54 Cal.4th at p. 655; *People v. Gilbert* (1965) 63 Cal.2d 690, 704.) In 2009, the Supreme Court held that in provocative act murder cases "the degree of murder liability is determined by examining the defendant's personal mens rea." (*Concha*, *supra*, 47 Cal.4th at p. 663.) As a consequence, since 2009, "[a] murder conviction under the provocative act doctrine . . . requires proof that the defendant personally harbored the mental state of malice." (*Gonzalez*, *supra*, 54 Cal.4th at p. 655.)

Because Sen. Bill 1437's amendment to section 188 only barred convictions for malice imputed to defendants (§ 188, subd. (a)(3)), convictions under the provocative act doctrine after 2009 remain valid under current law. Accordingly, courts repeatedly have held that defendants convicted of murder under the provocative act doctrine after that time are not entitled to resentencing under section 1172.6. (See, e.g., *People v. Venancio* (2025) 114 Cal.App.5th 593, 611-612; *People v. Cunningham* (2025) 112 Cal.App.5th 1243, 1249-1250; *People v. Mancilla* (2021) 67 Cal.App.5th 854, 859, 867-868; *People v. Swanson* (2020) 57 Cal.App.5th 604, 612-613.)

18

Rodriguez notes that in *People v. Antonelli* (2025) 17 Cal.5th 719 (*Antonelli*), the Supreme Court recently considered whether a defendant convicted of murder under the provocative act doctrine is entitled to resentencing under section 1172.6. However, in *Antonelli* the precise question before the Court was whether a defendant convicted under the provocative act doctrine is "categorically ineligible" for resentencing. (*Antonelli*, at p. 731.) The court concluded that such defendants are not categorically ineligible if they were convicted before 2009 when the Supreme Court "made clear that a defendant must personally harbor malice to be convicted of a provocative act murder." (*Id*. at pp. 728-729; see *id*. at p. 731 ["Because, under previous precedent, a jury could have imputed malice to a nonprovocateur defendant, the Court of Appeal was wrong to conclude that such a defendant would be categorically ineligible for section 1172.6 relief."].) When a defendant was convicted under the provocative act doctrine before 2009, the Supreme Court held that the jury instructions must be examined to determine whether the jury was permitted to convict under a theory imputing malice to the defendant. (*Id*. at pp. 731-732.)

*Antonelli* does not help Rodriguez because, as *Lopez* and *Nguyen* recognized, the transferred intent doctrine requires that the defendant personally harbor malice. (*Lopez*, *supra*, 99 Cal.App.4th at p. 1250; *Nguyen*, *supra*, 103 Cal.App.5th at p. 685.) Consequently, like defendants in provocative act doctrine cases after 2009, Rodriguez was not entitled to resentencing under section 1172.6.

Accordingly, we reject Rodriguez's contention that Sen. Bill 1437 abrogated the transferred intent doctrine. In light of that rejection, we need not reach Rodriguez's assertion that erroneous application of the doctrine violated due process. In addition, because Rodriguez was properly convicted of manslaughter under the transferred intent doctrine based on his intent to kill the Gonzalez brother, we need not consider Rodriguez's argument that there was insufficient evidence of his intent to kill Turcios.

19

## B. Rodriguez's Remaining Objections to His Conviction

In addition to challenging the trial court's application of the transferred intent doctrine, Rodriguez objects that there was insufficient evidence that he aided and abetted Turcios' manslaughter, that the trial court did not find his conduct carried a high probability of death, and that the trial court did not consider his youth at the time of the offense. These objections are meritless.

### 1. Sufficiency of the Evidence

The heading to the second argument in Rodriguez's brief asserts that "[t]here was insufficient evidence to support the lower court's finding that appellant aided and abetted an implied malice murder." (Capitalization & boldface omitted.) Later, Rodriguez describes the substantial evidence standard. However, he does not supply any analysis of the evidence presented at trial. Accordingly, his sufficiency argument has been forfeited. (See, e.g., *Williams*, *supra*, 16 Cal.4th at p 206; *Benach*, *supra*, 149 Cal.App.4th at p. 852.)

### 2. Probability of Death

Rodriguez objects that the trial court failed to make any finding whether his conduct created a high probability of death, which he contends is needed to find the conscious disregard required to establish implied malice. However, a conviction may be reversed for error only if that error was prejudicial (Cal. Const., Art. VI, § 13), and Rodriguez does not—and cannot—show prejudice. "A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life . . . ." (*People v. Bryant* (2013) 56 Cal.4th 959, 968.) The trial court found Rodriguez guilty of manslaughter because the evidence demonstrated both that he aided and abetted Vargas with "an intent to kill the Gonzalez brothers" and, alternatively, that he did so "with conscious disregard for human life." Thus, even if the trial court erred in finding conscious disregard and implied malice, Rodriguez was not

prejudiced because the court also found that he was guilty of aiding and abetting Turcios' death based on the alternative theory that he acted with intent to kill the Gonzalez brother.

### 3. *Youth*

Finally, Rodriguez objects that the trial court failed to consider his youth at the time of Turcios' shooting, which he argues is a relevant factor in determining whether he acted with reckless indifference. Here again, Rodriguez does not—and cannot—show any prejudice because, as just pointed out, the trial court also found that he had an intent to kill and therefore was properly found guilty even absent reckless disregard.

In sum, Rodriguez has failed to demonstrate any error in the trial court's finding that he was guilty of manslaughter under current law, and therefore we conclude that the trial court properly denied resentencing under section 1172.6.

## C. The Abstract of Judgment

In the alternative, Rodriguez argues that, if his sentence is not vacated, the abstract of judgment should be corrected because the trial court mistakenly awarded him 768 rather than 770 days of actual custody credits and 883 rather than 885 days of total credits. The Attorney General concedes that Rodriguez's credits were miscalculated, and we accept that concession.

The record shows that Rodriguez was arrested on May 6, 2011 and sentenced on June 13, 2013. As both the date of arrest and the sentencing should be included in credit calculations (*People v. Bravo* (1990) 219 Cal.App.3d 729, 735), Rodriguez is entitled to 770 days of actual custody credits. In addition, because voluntary manslaughter is a violent felony (§ 667.5, subd. (c)(1)), Rodriguez was entitled to accrue conduct credits for 15 percent of his days in custody (§ 2933.1, subd. (a)), which translates to 115 days of conduct credits and 885 total days of presentence credits. The trial court therefore erred in awarding Rodriguez only 768 days of actual custody credits and 883 days of total credits.

As the failure to properly calculate custody and conduct credits is a jurisdictional error that may be corrected at any time (see, e.g., *People v. Chilleli* (2014) 225 Cal.App.4th 581, 591), we order the abstract of judgment corrected to reflect that Rodriguez had 770 days of actual custody credits, 115 days of conduct credits, and 885 total days of presentence credits.

### III.  DISPOSITION

The order of May 16, 2024 denying the petition for rehearing is affirmed.  In addition, the trial court is directed to prepare a new abstract of judgment that indicates that at sentencing Rodriguez was entitled to 770 days of custody credits, 115 days of conduct credits, and a total of 885 days of presentence custody credits.

The trial court clerk is directed to forward a copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation.

_____

BROMBERG, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

DANNER, J.

*People v. Rodriguez*
H052160